

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MARY LINDA MCCALL, on behalf of herself and all others similarly situated, | |
| *Plaintiff,* | Civil Action No. |
| v. | CLASS ACTION COMPLAINT |
| CHESAPEAKE ENERGY CORP.; CHESAPEAKE EXPLORATION, LLC; CHESAPEAKE LOUISIANA, LP; CHESAPEAKE INVESTMENTS, LP; CHESAPEAKE APPALACHIA, LLC; AUBREY K. MCCLENDON, INDIVIDUALLY AND AS SOLE GENERAL PARTNER OF CHESAPEAKE INVESTMENTS, LP; MS TELA, LLC; MS PERMIAN, LLC; MORGAN STANLEY; OBSIDIAN NATURAL GAS TRUST; WELLS FARGO DELAWARE TRUST COMPANY, NA; BARCLAYS CAPITAL, INC, A DIVISION OF BARCLAYS BANK PLC.; ARGONAUT VPP, LLC; GS LOAN PARTNERS, A DIVISION OF THE GOLDMAN SACHS GROUP, INC.; SOONER GAS TRUST; WELLS FARGO & COMPANY AND WELLS FARGO SECURITIES LLC, SUCCESSOR IN INTEREST TO WACHOVIA CAPITAL MARKETS, LLC; FALCON VPP LP; TW INVESTORS LLC; BLUE DEVIL TRUST; AND DB ENERGY TRADING LLC, AN OPERATING SUBSIDIARY OF DEUTSCHE BANK AMERICAS HOLDING CORP. | **JURY TRIAL DEMANDED** |
| *Defendant.* | |

## INTRODUCTION

Plaintiff Mary Linda McCall brings this class action on behalf of herself and all others similarly situated against Defendants Chesapeake Energy Corp.; Chesapeake

Exploration, LLC; Chesapeake Louisiana, LP; Chesapeake Investments, LP; Chesapeake Appalachia, LLC; Aubrey K. McClendon, individually and as Sole General Partner of Chesapeake Investments (collectively "Chesapeake"); MS Tela, LLC; MS Permian, LLC; Morgan Stanley; Obsidian Natural Gas Trust; Wells Fargo Delaware Trust Company, NA; Barclays Capital, Inc., a division of Barclays Bank PLC; Argonaut VPP, LLC; GS Loan Partners, a division of The Goldman Sachs Group, Inc.; Sooner Gas Trust; Wells Fargo & Company and Wells Fargo Securities f/k/a Wachovia Capital Markets, LLC; Falcon VPP LP; TW Investors LLC; Blue Devil Trust; and DB Energy Trading LLC, an operating subsidiary of Deutsche Bank Americas Holding Corp. (collectively the "Bank Defendants") (Chesapeake and Bank Defendants are collectively referred to as "Defendants"). All allegations are made on information and belief except where specifically identified. Plaintiff seeks a full accounting from Chesapeake and the Bank Defendants, as well as an award of actual damages, exemplary damages, imposition of a constructive trust, an accounting, declaratory relief, a permanent injunction, and attorney's fees, interest, and costs.

## NATURE OF THE ACTION

1. This is a class action to recover hundreds of millions—perhaps billions— of dollars due and owing to thousands of working interest owners in thousands of producing Chesapeake oil and gas leases whose share of unproduced minerals in the ground were improperly partitioned and sold by Chesapeake for $5 billion in cash under nine volumetric production payment transactions.

***Volumetric Production Payments***

2.      A Volumetric Production Payment ("VPP") is a contractual arrangement between a seller, who owns oil and gas interests, and a buyer, which includes investment banks, hedge funds, energy companies and insurance companies, among others. A VPP works as a structured investment.

3.      In a VPP, the seller, who (1) usually is the operator of the relevant leases and owns part of the leasehold rights, and (2) is a co-tenant with the other leasehold interest owners (as is the case here with Chesapeake), sells a specific volume of unproduced minerals in the ground under a specified lease or pool of leases. The buyer becomes the owner of the minerals in the ground, thus owning a real property interest, and is entitled to receive a stated monthly quota—usually in raw output, free of any costs, which is then marketed by the VPP buyer.

4.      A VPP is advantageous for the buyer for two reasons. First, a buyer does not have to contribute time or capital (or risk) to the actual production of the end product. Second, VPP transactions typically remain off the parties' balance sheets and do not trigger immediate tax liability. Many VPP buyers also hedge their expected receivables (the volumes described in the contract) on the derivatives market to protect against commodity risk or otherwise lock in the expected profits. VPP buyers, therefore, can profit regardless of whether the value of their interest rises or falls. It is believed that the Bank Defendants use their energy trading departments to conduct sophisticated, unregulated, and profitable trading using the volumes of oil and gas delivered under the Chesapeake VPPs.

3

### *The Role of Chesapeake in VPP Agreements*

5.     Chesapeake owns an undivided leasehold interest in the minerals forming the substance of the nine VPPs. But Chesapeake does not own all the interest. It has other co-tenants who own their percentage share of the minerals as well, and these interests are undivided. The rights of the mineral leasehold owners are defined in part by common law and in part by standard form contracts, called joint operating agreements ("JOA" or "JOAs"). Chesapeake, as operator and a co-tenant, does not have the unbridled right to do as it pleases with the minerals in the ground. This case concerns those contractual limitations.

6.     A JOA is, in virtually all instances, a standard form document known as the AAPL Model Form Operating Agreement. This model JOA has been regularly used in the oil and gas industry from the 1950s through the present. The AAPL form JOA has undergone several revisions (the most recent of which was more than two decades ago), but the provisions in the model form relevant to this case have remained substantially the same for more than fifty years.

7.     Chesapeake and the Bank Defendants violated the rights of Plaintiff and other non-operating working interest owners, because they unilaterally partitioned and sold minerals in the ground that belonged to all working interest owners in the affected leases and pooled units. Chesapeake, with the assistance and complicity of the Bank Defendants, wrongfully retained all the proceeds of those sales for its sole use and benefit—an unjust profit of approximately $5 billion since late December 2007. The Bank Defendants have used and continue to use the oil and gas reserves belonging to the Class to earn substantial profits through energy trading transactions.

4

8. Chesapeake has used its VPPs—and the $5 billion it has horded for itself from those transactions—to generate operating capital and acquisition funding off the books without borrowing money using traditional debt (loans and bonds) or issuing additional capital stock.

9. Chesapeake's conduct is wrongful because it is in breach of the standard language in its JOAs with the Class.

### *The Bank Defendants' Liability for this Wrongful Conduct*

10. The JOAs contain contractual provisions that bind the VPP buyers under the JOAs just as Chesapeake is bound, and as a result, the Bank Defendants and their affiliates are liable to the Class in the same manner as Chesapeake, independently and as co-conspirators with Chesapeake.

## PARTIES

### *Plaintiff*

11. Plaintiff Mary Linda McCall ("McCall") is a citizen of Texas and a resident of Harris County, Texas. McCall is a party to at least two JOAs with Chesapeake. McCall is a non-operating working interest owner in several wells operated by Chesapeake, including the Amos 1-29 well, the Sharum 1A-30 well, the Flora 1-23 well and the Gilliland 2-23 well, all of which are located in Beckham County, Oklahoma. Those four wells are the subject of several of the VPPs described in this Complaint.

### *Defendants*

12. Defendant Chesapeake Explorations, LLC is an Oklahoma limited liability company with its principal place of in Oklahoma City, Oklahoma and can be served with process by serving The Corporation Company, 1833 South Morgan Road, Oklahoma City, Oklahoma 73128.

13.     Defendant Chesapeake Exploration, LLC is an Oklahoma limited liability company with its principal place of business in Oklahoma City, Oklahoma and can be served with process by serving The Corporation Company, 1833 South Morgan Road, Oklahoma City, Oklahoma 73128.

14.     Defendant Chesapeake Louisiana, LP is an Oklahoma limited partnership with its principal place of business in Oklahoma City, Oklahoma and it can be served with process by serving The Corporation Company, 1833 South Morgan Road, Oklahoma City, Oklahoma 73128.

15.     Defendant Chesapeake Investments, LP is an Oklahoma limited partnership with its principal place of business in Oklahoma City, Oklahoma and it can be served with process by serving The Corporation Company, 1833 South Morgan Road, Oklahoma City, Oklahoma 73128.

16.     Defendant Chesapeake Appalachia, LLC is an Oklahoma limited liability company with its principal place of business in Oklahoma City, Oklahoma and can be served with process by serving The Corporation Company, 1833 South Morgan Road, Oklahoma City, Oklahoma 73128.

17.     Defendant Aubrey K. McClendon, individually and as Sole General Partner of Chesapeake Investments, LP is a citizen of Oklahoma and can be served with process in both capacities by serving him at 6902 Avondale Drive, Oklahoma City, Oklahoma 73116.

18.     Defendant MS Tela LLC is a Delaware limited liability company with its principal place of business at the commodities trading office of Morgan Stanley in

6

Purchase, New York and can be served with process by serving The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

19. MS Permian LLC is a Delaware limited liability company with its principal place of business at the commodities trading office of Morgan Stanley in Purchase, New York and can be served with process by serving The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

20. Defendant Morgan Stanley is a Delaware corporation with its principal place of business at 1585 Broadway New York, New York 10036 and can be served with process by serving The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington Delaware 19801.

21. Defendant Obsidian Natural Gas Trust is a Delaware statutory trust and can be served with process by serving its Owner Trustee Wells Fargo Delaware Trust Company, NA at 919 Market Street, Suite 1600, Wilmington, Delaware 19801.

22. Defendant Wells Fargo Delaware Trust Company, NA, Owner Trustee of Obsidian Natural Gas Trust and Sooner Gas Trust is a Delaware trust company can be served with process at 919 Market Street, Suite 1600, Wilmington, Delaware 19801.

23. Defendant Barclays Capital, Inc. is an investment division of Barclays Bank PLC with its principal place of business located at 200 Park Avenue, New York, New York 10166 and can be served with process by serving CT Corporation System, 111 Eighth Avenue, New York, New York 10011.

24. Defendant Argonaut VPP, LLC is a Delaware limited liability company located in Tulsa, Oklahoma and can be served with process by serving the Corporation Service Company 2711 Centerville Road. Suite 400, Wilmington, Delaware 19808.

25.     Defendant GS Loan Partners, a division of The Goldman Sachs Group, Inc., a Delaware corporation with its principal place of business at 200 West Street, New York, New York can be served with process by serving Corporation Trust Center 1209 Orange Street, Wilmington, Delaware 1980.

26.     Defendant Sooner Gas Trust is a Delaware statutory trust that can be served with process by serving its Owner Trustee Wells Fargo Delaware Trust Company, NA at 919 Market Street, Suite 1600, Wilmington, Delaware 19801.

27.     Defendant Wells Fargo & Company, a Delaware corporation, and Wells Fargo Securities, the trade name for certain capital markets and investment services of Wells Fargo & Company and its subsidiaries, including Wells Fargo Securities, LLC (successor in interest to Wachovia Capital Markets, LLC), maintains its principal place of business at 600 California Street, Suite 1600, San Francisco, California 94108 and regularly conducts business in this District. It can be served with process by serving the Corporation Service Company, 327 Hillsborough Street, Raleigh, North Carolina 27603.

28.     Defendant Falcon VPP LP is a Delaware limited partnership with its principal place of business at the Houston, Texas offices of Quintana Minerals and can be served with process by serving Capitol Services, Inc., 615 South DuPont Highway, Dover, Delaware 19901.

29.     Defendant TW Investors LLC is a Delaware limited liability company with its principal place of business at the offices of Wells Fargo & Company and can be served with process by serving United Corporate Services, Inc., 874 Walker Road, Suite C, Dover, Delaware 19904.

30.     Defendant Blue Devil Trust is a Delaware statutory trust that can be served with process by serving Wells Fargo Delaware Trust Company, NA at 919 Market Street, Suite 1600, Wilmington, Delaware 19801.

31.     Defendant DB Energy Trading LLC is a Delaware limited liability company with its principal place of business at the offices of Deutsche Bank Americas Holding Corp, 60 Wall Street, Suite 3600, New York, New York 10005-2836 and can be served with process by serving CT Corporation System, 111 Eighth Avenue, New York, New York, 10011.

## JURISDICTION AND VENUE

32.     This Court has original jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action with more than 100 class members; the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs; and at least one Defendant is a citizen of a different state than at least one class member.

33.     This Court has personal jurisdiction over Defendants because all or a substantial portion of the wrongdoing alleged in this Complaint took place in this state. Defendants are authorized to do business in this state, have sufficient minimum contacts with this state, and/or otherwise intentionally avail themselves of the Southern District of New York to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

34.     Venue in this Court is proper in the Southern District of New York because a substantial part of the events giving rise to the claims has occurred and continue to occur in this District.

35.     Based on information and belief, McCall and the Class allege that the overall scheme alleged was conceived in and carried out (and is still being carried out) in large part in the Southern District of New York.

36.     At least three of the Bank Defendants (all VPP buyers) are located in this District; the scheme was implemented in large part in this District; and it is believed that other VPPs are actually administered and carried out in this District. All of the VPPs at issue appear to be Wall Street bank devised, structured, funded and administered transactions. On information and belief, the VPP buyer entities named in this case (and included among the Bank Defendants) are nothing more than special purpose entities or special purpose vehicles that exist on paper only. These entities were created as receptacles for loans by the Bank Defendants, and the actual day to day operations of the various VPP transactions are carried out by the Bank Defendants' energy trading departments, located primarily in the Southern District of New York. In most instances, addresses and contact information for the VPP buyers are Bank Defendant addresses.

37.     Some of the Bank Defendants, including Morgan Stanley, Goldman Sachs, Deutsche Bank, and Barclays Bank, are located in this District.

38.     An essential element of the Defendants' scheme described here—in fact, the key to its success—is the conduct of the Bank Defendants, who market the oil and gas production under the VPPs using their sophisticated energy trading and logistics departments. On information and belief, those trading activities have been and continue to be conducted largely in this District.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

39.     Chesapeake leases or acquires existing leases from owners of mineral estates so that Chesapeake can develop and exploit the subsurface minerals in exchange for royalty and other payments to the owners of the mineral estates.

40.     After Chesapeake acquires oil, gas and mineral leases from the owners of mineral estates, Chesapeake then sells a portion of its leasehold estates to investors who are then contractually obligated to help fund the cost of exploration and development in exchange for a percentage of the mineral leasehold. Chesapeake and the investors are co-tenant owners of the mineral leasehold and are commonly referred to as the "working interest owners."

41.     Chesapeake generally is the operator of the leases and consequently is in charge of drilling, completing, and operating the oil and gas wells drilled on the leaseholds for the benefit of all the working interest owners. The non-operator working interest owners receive monthly statements and checks from the operator (Chesapeake) for their net percentage share of proceeds from sales of minerals produced on the lease (reduced by (1) royalties paid to the mineral owners who leased his land; (2) operating expenses; and (3) severance taxes).

42.     In virtually all instances, Chesapeake enters into a JOA with the other working interest owners (or is subject to and bound by a pre-existing JOA) to provide a sense of order among the mineral co-tenants. As stated above, the JOAs typically are form documents known as the AAPL Model Form Operating Agreement.

43.     For purposes of this Complaint, there are four relevant provisions in the model JOAs:

11

a.    **The "Interests of Parties" clause.**  This clause states, in relevant part, as follows: (1) "Exhibit '__' lists all of the parties, and their respective percentage or fractional interests under this agreement . . . . All production of oil and gas . . ., subject to the payment of lessor's royalties, shall also be owned by the parties in the same manner", or (2) "[A]ll equipment and materials acquired in operations of the [lease] shall be owned by the parties as their interests are set forth in Exhibit '__.' . . . The parties shall also own all production of Oil and Gas from the [lease] subject, however, to the payment of royalties and other burdens on production described hereafter.";

b.    **The "Maintenance of Uniform Ownership Interest" clause.**  This clause states, in relevant part, as follows: "For purposes of maintaining uniformity of ownership in the oil and gas leasehold interests covered by this contract, and notwithstanding any other provisions to the contrary, no party shall sell, encumber, transfer or make any other disposition of its interest in the leases . . . and in the wells, equipment and production unless such disposition covers either: (1) the entire interest of the party in all [leases, interests, wells] and equipment and production; or (2) an equal undivided percent of the party's present interest in all [leases, interests, wells] and equipment and production . . . . Every such sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement, and shall be made without prejudice to the rights of the other parties . . . .";

      c.    **The "Subsequently Created Interest" clause.** This clause states, in relevant part, as follows: (1) "Notwithstanding anything herein to the contrary, if any working interest owner shall, subsequent to the execution of this agreement, create an overriding royalty, production payment, net proceeds interest, carried interest or any other interest out of its working interest (hereinafter called 'subsequently created interest'), such subsequently created interest shall be specifically made subject to all the terms and provisions of this agreement . . .", or (2) "Every sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement ..., and any transferee of an ownership interest in any Oil and Gas Lease or Interest shall be deemed a party to this agreement as to the interest conveyed . . . ."; and

      d.    **The "Waiver of Rights to Partition" clause.** This clause states, in relevant part, as follows: "[E]ach party hereto owning an undivided interest in the [lease] waives any and all rights it may have to partition and have set aside to it in severalty its undivided interest herein."

44.    These clauses prohibit an operator, such as Chesapeake, from purporting to sell for itself only a portion of the mineral reserves in the ground under a leasehold estate.

45.    The "Maintenance of Uniform Ownership Interest" clause, for example, specifically prohibits one co-tenant (the operator) from attempting to unilaterally partition and sell for its own benefit a portion of the oil and gas still in the ground (in the well

reservoir or formation). Any such sale must be for the benefit of all working interest owners in the subject lease, according to their ownership percentage.

46.     Based on the "Subsequently Created Interest" clause in the JOAs, the Bank Defendants became bound by the JOAs as soon as they received their conveyances of real property interests under the VPPs from Chesapeake. The VPP buyers and Bank Defendants, upon information and belief, conduct extensive due diligence before paying Chesapeake hundreds of millions (billions) of dollars under the VPP transactions. As part of the due diligence process, the Bank Defendants were aware of and reviewed the JOAs, which outline the rights of the working interest owners. Based on clear and unambiguous language in the JOAs, upon closing of the VPP transactions in which real property interests were expressly created and conveyed by Chesapeake to the Bank Defendants or their special purpose entities, the Bank Defendants and the VPP buyers become subject to and bound by the terms of the JOAs. This is true regardless of any futile attempt by the Bank Defendants to disavow any such contractual relationships using language inserted into the VPP purchase and sale agreements. The leasehold interests conveyed by Chesapeake to the Bank Defendants under the VPPs remain subject to the terms and conditions of the JOAs and consequently, the Bank Defendants, as grantees from Chesapeake, are bound by the JOAs just as Chesapeake is bound.

47.     Unproduced oil, gas and mineral reserves in the ground remain part of the undivided mineral estate (real property), owned jointly by all the cotenants on a molecule by molecule basis, until they are produced and extracted from the ground. Once produced and extracted from the ground, minerals become personal property. A VPP is a

unilateral partition and sale of minerals in the ground in exchange for a lump sum cash payment.

48.     Typically, a VPP seller like Chesapeake contracts with a hedge fund, investment bank, or similar Wall Street investment group (the VPP buyer).

49.     The VPP buyer generally undertakes a comprehensive due diligence process before entering into the VPP agreement and has actual and constructive knowledge of the JOAs in effect.

50.     Under a VPP, the operator of a lease or, more commonly, a group of leases, purports to partition and sell only part of its share of the estimated reserves of oil or gas in the ground in return for a large upfront cash payment. The operator of the lease then keeps that large cash payment for itself and does not share the payment with the other working interest owners.

51.     The operator must then deliver predetermined volumes of oil or gas production from the lease (or leases) to the VPP buyer each month, free of any costs, for the term of the VPP (usually 4 to 6 years).

52.     Though clever investment bankers and lawyers paper the transaction to maximize tax and other benefits, the upshot of a VPP is this: ***One co-tenant is partitioning in the ground and selling part of the co-tenancy estate for itself without sharing the proceeds with its other co-tenants, in direct violation of both the Maintenance of Uniform Ownership Interest clause of the JOA, and common law principles of co-tenancy, which directly prohibit such conduct.***

53.     Chesapeake and several special purpose entities or special purpose vehicles formed by the Bank Defendants have entered into at least nine VPP transactions

since December 2007 to generate nearly $5 billion dollars in off-the-books operating capital for Chesapeake. On information and belief, those special purpose entities or special purpose vehicles are controlled by the Bank Defendants.

54.      None of this money has been paid to other working interest owners, with one exception. The CEO of Chesapeake, Aubrey K. McClendon, is a small working interest owner in many of Chesapeake's leases, a benefit he enjoys as part of his compensation package. In 2008, the same year McClendon suffered severe financial setbacks from leveraged trading that resulted in the loss of most of his Chesapeake stock holdings, Chesapeake apparently allowed McClendon to enter into two private VPPs— Blue Devil VPP and TW Investors VPP. Those two VPPs paid McClendon many millions of dollars, which he apparently retained for himself even though a portion of the other working interest owners' share of the minerals in the ground were sold too.

55.      Under the VPP contracts, Chesapeake must deliver to the Bank Defendants large volumes of oil and gas, cost free, every month for many years to come. On information and belief, Chesapeake has burdened the other working interest owners with operating costs attributable to the VPP volumes delivered cost-free each month to the Bank Defendants.

56.      The Bank Defendants control and administer the VPP contracts from their energy trading departments located in New York City and elsewhere. The entities designated as the VPP buyers are, upon information and belief, nominal entities existing on paper only and serving as nothing more than conduits for the banks to "loan" money to fund the VPP transactions, which the banks then administer through their energy trading departments in New York City and elsewhere.

57.     Chesapeake and the Bank Defendants have thus far entered into at least nine VPP contracts under which Chesapeake has sold for cash a portion of unproduced mineral reserves in the ground located in eight states: Oklahoma, Texas, Arkansas, New Mexico, Louisiana, Kansas, Kentucky and West Virginia.

58.     Chesapeake has kept all of the cash proceeds of those sales, refusing to pay its fellow working interest owners in those leases their rightful percentage share of the cash proceeds despite a legal obligation to do so. McClendon is a vice-principal of Chesapeake, the sole general partner of Chesapeake Investments LP, and a VPP party through Blue Devil and TW Investors, which are the two VPPs entered into by Chesapeake Investments, LP.     The two VPPs of McClendon using Chesapeake Investments LP were entered into with express knowledge, consent, and involvement of Chesapeake Energy Corp., and Chesapeake is jointly and severally liable for all damages sustained by McCall and the Class as a result of McClendon's conduct in entering into self-serving VPPs through Chesapeake Investments LP.

59.     Using complex and deceptive accounting, Chesapeake hides its wrongdoing from McCall and the Class and, on information and belief, diverts excessive volumes of oil and gas production from the subject leases to its VPP partners, which causes substantial imbalances and further damages their mineral co-tenants.

60.     Since December 31, 2007, Chesapeake has entered into at least nine VPP transactions (collectively "VPP Agreements") detailed further below:

    a.      The Obsidian-Barclays VPP (created September 30, 2010): This VPP is worth approximately $1.15 billion.     Parties include Chesapeake Exploration, LLC and Obsidian Natural Gas Trust (Barclays Capital, Inc.). This VPP covers wells in the Barnett Shale, which is located in North Texas.

17

b. The MS Permian–Morgan Stanley VPP (created June 11, 2010): This VPP is worth approximately $335 million. Parties include Chesapeake Exploration, L.L.C and MS Permian LLC (Morgan Stanley). This VPP covers wells in the Spraberry Field located in West Texas and New Mexico.

c. The MS Tela-Morgan Stanley VPP (created February 5, 2010): This VPP is worth approximately $180 million. Parties include Chesapeake Exploration, LLC, Chesapeake Louisiana, LP, and MS Tela LLC (Morgan Stanley). This VPP covers wells in East Texas, Louisiana and offshore wells under the waters of Texas and Louisiana.

d. The Falcon VPP (created August 3, 2009): This VPP is worth approximately $370 million. Parties include Chesapeake Exploration, LLC and Falcon VPP, LP. This VPP covers wells in the Eagle Ford Shale, which is located in South Texas.

e. The Argonaut–Goldman Sachs VPP (created December 31, 2008): This VPP is worth approximately $412 million. Parties include Chesapeake Exploration, LLC and Argonaut VPP, LLC (GS Loan Partners). This VPP covers wells in the Anadarko and Arkoma Basins, which are located in Oklahoma and Arkansas.

f. Blue Devil–Wells Fargo VPP (created on or about August 21, 2008): This VPP is worth an unknown amount, believed to be in the many millions of dollars. Parties include McClendon, Chesapeake Investments, and Blue Devil Trust (Wells Fargo - owner, trustee). This VPP covers wells in the Anadarko Basin, located in Oklahoma, Kansas, and the Texas Panhandle.

g. The Sooner Gas–Wells Fargo VPP (created August 1, 2008): This VPP is worth approximately $594 million. Parties include Chesapeake Exploration, LLC and Sooner Gas Trust (Wells Fargo - owner trustee). This VPP covers wells in the Anadarko Basin in Oklahoma.

h. TW Investors–Wells Fargo VPP (created on or about January 31, 2008): This VPP is worth approximately $616 million. Parties include McClendon, Chesapeake Investments, LP and TW Investors LLC, formerly Wachovia Capital Markets (Wells Fargo – owner, trustee). This VPP covers wells in the Anadarko Basin, which is located in Oklahoma and Kansas.

i. The DB Energy–Deutsche Bank VPP (created on or about December 31, 2007): This VPP is worth approximately $1.1 billion. Parties include Chesapeake Appalachia, LLC and DB Energy Trading LLC, which is an operating subsidiary of Deutsche Bank Americas Holding Corp. This VPP covers wells in located West Virginia and Kentucky.

61.     McCall seeks to certify a national class of working interest owners, who are believed to number in the many thousands, to recover the substantial sums, possibly in excess of $1 billion, owed to the class along with declaratory relief, injunctive relief, attorney's fees and costs of suit.

## CLASS ACTION ALLEGATIONS

62.     McCall brings this action under Federal Rules of Civil Procedure 23(a), 23(b)(1), 23(b)(2), and 23(b)(3), on behalf of herself and all others similarly situated.

63.     The Relevant Time Period for this class action begins on December 31, 2007, and goes through the present.

64.     McCall  seeks to represent the following Class:

All persons and entities who own or owned non-operating working interests in oil, gas, and mineral leases subject to joint operating agreements that are covered by a Volumetric Production Payment (VPP) transaction entered into by Chesapeake during the Relevant Time Period. Excluded from this Class are Defendants; the officers, directors and employees of Defendants (including Aubrey K. McClendon); any entity in which Defendants have a controlling interest; and any affiliate, legal representative, heir of assign of Defendants; also excluded are any currently sitting federal court judge and/or justice in the current style and/or any persons within the third degree of consanguinity to such judge and/or justice.

65.     At all material times, McCall was and is within the Class defined above. Based on her experiences described above, McCall's claims are typical of the Class she seeks to represent.

66.     The requirements of Rule 23(a) are satisfied because the members of the Class are so numerous and geographically dispersed that joinder of all its members is impracticable.  The precise number of Class members is unknown to McCall, but it is

clear that the number greatly exceeds the number to make joinder impracticable. The "numerosity" requirement of Rule 23(a)(1) is, therefore, satisfied.

67.    The "commonality" requirement of Rule 23(a)(2) is satisfied because there are questions of law or fact common to McCall and the other members of the Class she seeks to represent. There is a well-defined community of interest in the questions of law and fact at issue in this action. The questions of law and fact common to McCall and the Class predominate over any questions affecting only individual members. These common legal and factual questions include the following:

      a.     Whether Chesapeake breached the terms of the JOAs;

      b.     Whether the Bank Defendants are bound by and breached the terms of the JOAs;

      c.     Whether Chesapeake and the Bank Defendants conspired to deprive the Class of their contractual rights by entering into the VPP transactions;

      d.     Whether Chesapeake committed fraud against the Class;

      e.     Whether Chesapeake is guilty of conversion of proceeds owned by the Class;

      f.     Whether the Bank Defendants conspired with Chesapeake to commit fraud against the Class;

      g.     Whether the Bank Defendants conspired with Chesapeake to convert proceeds owned by the Class;

      h.     Whether the Bank Defendants tortiously interfered with existing contractual rights of the Class;

      i.     Whether Class members were damaged by Defendants' misconduct; and

      j.     The nature and extent of damages and other remedies to which the Class members are entitled, including an injunction, an accounting and imposition of a constructive trust.

68.    The injuries sustained by the class members flow, in each instance, from a common nucleus of operative facts. In each case McCall and other members of the Class

are co-tenants and have contractual agreements with Chesapeake, and Chesapeake, contrary to the terms of the JOAs and common law, entered into VPP agreements with the Bank Defendants which resulted in the Class losing hundreds of millions if not billions of dollars.

69.     McCall's claims are typical of the claims of all other members of the Class that she seeks to represent, as described above, because they arise from the same course of conduct by Defendants and are based on the same legal theories—as do the claims of all other members of the Class. Moreover, McCall seeks the same forms of relief for herself as she does on behalf of absent Class members.  Accordingly, McCall has satisfied the "typicality" requirements of Rule 23(a)(3) with respect to the Class she seeks to represent.

70.     Because her claims are typical of the Class that she seeks to represent, McCall has every incentive to pursue those claims vigorously. McCall has no conflicts with, or interests antagonistic to, the working interest owners comprising the other members of the Class she seeks to represent regarding the claims set forth herein.  Also, McCall's commitment to the vigorous prosecution of this action is reflected in her retention of competent counsel experienced in litigation of this nature to represent her and the other members of each of the Classes.    McCall's counsel satisfies the requirements of Rule 23(g) to serve as counsel for the Class. McCall's counsel will fairly and adequately represent the interests of the Class, and (a) have identified and thoroughly investigated the claims set forth herein; (b) are highly experienced in the management and litigation of class actions and complex litigation in general, including litigation of similar types of claims; (c) have extensive knowledge of the applicable law; and (d)

21

possess the resources to commit to the vigorous prosecution of this action on behalf of the proposed Classes. Accordingly, McCall satisfies the adequacy of representation requirements of Rule 23(a)(4) with respect to the Class.

71.     In addition, this action meets the requirements of Rule 23(b)(1). Absent a representative class action, members of the Class would continue to suffer the harms described herein, for which they would have no remedy. Even if separate actions could be brought by individual mineral rights holders, the resulting multiplicity of lawsuits would cause undue hardship and expense for both this Court, the judicial system more broadly, and the litigants, as well as create a risk of inconsistent rulings and adjudications that might be dispositive of the interests of similarly situated mineral rights holders, substantially impeding their ability to protect their interests, while establishing incompatible standards of conduct for Defendants.

72.     This action also meets the requirements of Rule 23(b)(2), because Defendants have acted or refused to act on grounds generally applicable to Plaintiff and the other members of the Class, thereby making final injunctive or corresponding declaratory relief appropriate.

73.     This action also meets the requirements of Rule 23(b)(3). Common questions of law or fact, including those enumerated above, exist as to the claims of all members of the Class and predominate over questions affecting only individual Class members, and a class action is the superior (if not the only) method for the fair and efficient adjudication of this controversy. Class treatment will permit large numbers of similarly-situated persons to prosecute their respective class claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort,

and expense that numerous individual actions would produce. Furthermore, while damages to members of the Class are substantial in the aggregate, the damages to any individual member of any of the proposed Class may be insufficient to justify individually controlling the prosecution of separate actions against Defendants.

## CAUSES OF ACTION

## COUNT ONE

### Breach of Contract Against Chesapeake

74.     Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

75.     Chesapeake is subject to the terms of at least two JOAs with working interest owner McCall in at least four wells covered by at least three of the VPPs described in this Complaint, including the Amos 1-29 well, the Sharum 1A-30 well, the Flora 1-23 well and the Gilliland 2-23 well located in Beckham County, Oklahoma.

76.     The JOAs between McCall and Chesapeake are standard form AAPL Model Form operating agreements, containing the following relevant provisions common to the Class:

   a.     an "Interests of Parties" clause;

   b.     a "Maintenance of Uniform Ownership Interest" clause;

   c.     a "Subsequently Created Interest" clause; and

   d.     a "Waiver of Rights to Partition" clause.

77.     The JOA clauses listed in (a) through (d) above (collectively the "Contractual Clauses") prohibit Chesapeake from partitioning and selling solely for itself a portion of the minerals in the ground under a leasehold estate.

23

78.     Under the express terms of the JOAs, Chesapeake's assignees and grantees of any portion of its leasehold interests, including the grantees of the interests conveyed under the nine VPPs, are also bound by the Contractual Clauses. The Bank Defendants therefore became bound by the Contractual Clauses once they received their conveyances of real property interests under the VPPs.

79.     Chesapeake breached the JOA with McCall and the Class in at least three ways: (1) by attempting a unilateral partition and sale of part of the minerals in the ground for Chesapeake's sole benefit; (2) by failing to maintain uniformity of ownership among all co-tenants; and (3) by failing to account for and pay a portion of the VPP proceeds to McCall and the Class despite its contractual and common law duty to do so.

80.     On information and belief, Chesapeake is also overproducing the wells covered by the VPPs, including those in which McCall owns a working interest, resulting in severe imbalances and further damages to McCall and the Class.

81.     As a result of Chesapeake's breach of the JOA, McCall and the Class have been damaged in an amount to be determined at trial.

## COUNT TWO

### Breach of Contract Against the Bank Defendants

82.     Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

83.     By entering into the VPP transactions with Chesapeake, the Bank Defendants became subject to and bound by the terms of the JOAs covering McCall's and the Class' working interests, just as Chesapeake is bound by those JOAs. The JOAs

between McCall and Chesapeake, as well as the JOAs of the Class are standard form AAPL Model Form operating agreements containing the following relevant provisions:

    a.    an "Interests of Parties" clause;

    b.    a "Maintenance of Uniform Ownership Interest" clause ;

    c.    a "Subsequently Created Interest" clause ; and

    d.    a "Waiver of Rights to Partition" clause.

84.    The JOA clauses listed in (a) through (d) above (collectively the "Contractual Clauses") prohibit an operator like Chesapeake from partitioning and selling solely for itself a portion of the minerals in the ground under a leasehold estate. The Bank Defendants became bound by the Contractual Clauses once they entered into the VPP contracts.

85.    The Bank Defendants breached the JOA with McCall and the Class in at least three ways: (1) attempting a unilateral partition and sale of part of the minerals in the ground exclusively for Chesapeake's and the Bank Defendants' benefit; (2) by failing to maintain uniformity of ownership among all co-tenants; (3) by failing to account for and pay a portion of the VPP proceeds to McCall and the Class despite its contractual and common law duty to do so.

86.    As a result of the Bank Defendants' breach of the JOA, McCall and the Class have been damaged in an amount to be determined at trial.

## COUNT THREE

### Conversion Against All Defendants

87.    Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

88. McCall and the Class had a legal right to the mineral reserves in the ground covered by the VPPs as co-tenants with Chesapeake.

89. Defendants, in derogation of McCall's and the Class' rights to the mineral reserves covered by the VPPs, intentionally exercised dominion over McCall's and the Class' mineral reserves.

90. Chesapeake sold the mineral reserves without McCall's and the Class' knowledge, and failed to pay McCall and the Class their rightful share of the proceeds.

91. Bank Defendants, in derogation of McCall's and the Class' rights to the mineral reserves, purchased the mineral reserves from Chesapeake and failed to pay McCall and the Class their rightful share of the proceeds.

92. Defendants' wrongful dominion over McCall's and the Class' minerals constitutes conversion. McCall and the Class did not consent to Defendants' wrongful dominion over their mineral reserves.

93. McCall and the Class have been damaged by Defendants' conversion in an amount to be determined at trial.

## COUNT FOUR

### Conspiracy to Commit Conversion Against All Defendants

94. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

95. Defendants agreed that they would enter into an agreement whereby Chesapeake would wrongfully take possession of McCall's and the Class' minerals and sell part of the estimated reserves of those minerals belonging to McCall and the Class to the Bank Defendants in return for a large upfront cash payment from the Bank

Defendants and that Chesapeake would retain the proceeds and not share it with the other working interest owners despite a contractual and legal obligation to do so.

96.     Defendants purposefully and intentionally entered into VPPs which were purposefully structured to deprive McCall and the Class of their rights to the minerals and proceeds from the sale of said minerals.

97.     Defendants' actions damaged McCall and the Class in an amount to be determined at trial.

### COUNT FIVE

### Fraud Against Chesapeake

98.     Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

99.     Chesapeake's contractual obligations and representations   to McCall and the Class that it would pay and continue to pay McCall and the Class their rightful share of proceeds from sales of their minerals were material facts.

100.    Chesapeake made these representations to McCall and the Class with intent to defraud McCall and the Class knowing that it would enter into VPPs and fail to pay McCall and the Class proceeds from mineral sales.

101.    McCall and the Class reasonably relied on Chesapeake's representations that it had paid and would continue to pay proceeds from sales of minerals.

102.    Chesapeake's fraud resulted in damage to McCall and the Class in an amount to be determined at trial.

## COUNT SIX

### Conspiracy to Commit Fraud Against the Bank Defendants and Chesapeake

103.    Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

104.    Defendants agreed that they would enter into an agreement whereby Chesapeake would partition and sell part of the estimated reserves of oil or gas in the ground in return for a large upfront cash payment from the Bank Defendants.

105.    Defendants agreed that the Bank Defendants would pay Chesapeake for part of the estimated reserves of oil and gas in the ground, a portion of which belonged to McCall and the Class, and that Chesapeake would retain the proceeds and not share it with the other working interest owners despite a contractual and legal obligation to do so.

106.    Defendants agreed to enter into the VPPs with the intent to defraud McCall and the Class knowing that Chesapeake would fail to pay McCall and the Class proceeds from the mineral sales.

107.    Defendants' actions damaged McCall and the Class in an amount to be determined at trial.

## COUNT SEVEN

### Fraudulent Concealment Against Chesapeake

108.    Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

28

109.    Chesapeake knew that it had a contractual and common law duty to disburse proceeds from the VPP to McCall and the Class as a portion of the mineral reserves belonged to McCall and the Class.

110.    Chesapeake failed to disclose to McCall and the Class that it had sold a portion of their mineral reserves to the Bank Defendants pursuant to the VPPs.

111.    Chesapeake did not disclose that it had sold a portion of McCall's and the Class' mineral reserves and that it nonetheless believed it could retain for itself all proceeds paid by the Bank Defendants.

112.    McCall and the Class reasonably relied on Chesapeake's failure to disclose that it had sold a portion of the mineral reserves belonging to McCall and the Class to the Bank Defendants.

113.    McCall and the Class have been damaged by Chesapeake's fraudulent concealment in an amount to be determined at trial.

## COUNT EIGHT

### Conspiracy to Commit Fraudulent Concealment Against the
### Bank Defendants and Chesapeake

114.    Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

115.    The Bank Defendants knew that a portion of the mineral reserves they were purchasing from Chesapeake pursuant to the VPPs belonged to McCall and the Class.

116.    The Bank Defendants and Chesapeake agreed that they would not disclose to McCall and the Class that the Bank Defendants had purchased a portion of McCall's and the Class' mineral reserves from Chesapeake pursuant to the VPPs.

117.    Bank Defendants did not disclose that they had purchased a portion of McCall's and the Class' mineral reserves from Chesapeake to secure large volumes of future oil and gas production to facilitate their lucrative energy trading and hedging businesses. Chesapeake did not disclose that it had sold a portion of McCall's and the Class' mineral reserves to the Bank Defendants and that it nonetheless believed it could retain for itself all proceeds paid by the Bank Defendants.

118.    McCall and the Class  reasonably relied on Chesapeake's and the Bank Defendants' failure to disclose that the Bank Defendants had purchased a portion of the mineral reserves belonging to McCall and the Class.

119.    McCall and the Class have been damaged by Defendants' actions in an amount to be determined at trial.

## COUNT NINE

### Tortious Interference with Contract Against the Bank Defendants

120.    Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

121.    McCall's and the Class' contracts with Chesapeake under the JOAs were valid and existing contracts.

122.    The Bank Defendants had knowledge of those contracts.

123.    The Bank Defendants intentionally induced Chesapeake to breach its contracts with McCall and the Class and enter into the VPPs.

124.    As a result of Bank Defendants' tortious interference with McCall's and the Class' contracts, McCall and the Class have been damaged in an amount to be determined at trial.

30

**COUNT TEN**

**Request for Declaratory Relief**

125.    Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

126.    As stated above, Chesapeake partitioned and sold mineral reserves for its sole benefit belonging to McCall and the Class in violation of the express terms of the JOAs.

127.    For example, the Waiver of Rights to Partition clause of the AAPL Model Form JOA states, in relevant part, as follows: "Each party hereto owning an undivided interest in the [lease] waives any and all rights it may have to partition and have set aside to it in severalty its undivided interest herein." The Maintenance of Uniform Ownership Interest clause makes clear that a transaction like the VPPs in question results in a sale of minerals by all the working interest owners, according to their ownership percentage.

128.    Under the express language of the AAPL Model Form JOA, Chesapeake sold part of McCall's and the Class' mineral reserves, yet failed to pay Plaintiff and the Class their percentage share of proceeds.

129.    As grantees and transferees of mineral interests from Chesapeake the Bank Defendants are bound by and subject to the JOAs just as Chesapeake is bound.

130.    McCall and the Class seek declaratory relief to remedy these wrongs, including a declaratory judgment that the JOA prohibits Chesapeake from selling a portion of the mineral reserves for its exclusive benefit.

## COUNT ELEVEN

### Request for Imposition of a Constructive Trust

131.   Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein

132.   As an operating working interest owner, Chesapeake owed a fiduciary duty to McCall and the Class to account for and pay them monies belonging to them.

133.   A constructive trust on the proceeds from the VPPs is necessary to protect McCall's and the Class' rights.

134.   McCall and the Class request that the Court impose a constructive trust on the proceeds from the VPPs and on the oil and gas reserves set forth in the VPPs.

## COUNT TWELVE

### Full Accounting Against All Defendants

135.   Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

136.   Chesapeake has failed to pay McCall and the Class their portion of the VPP proceeds pursuant to the JOA.

137.   McCall and the Class seek and are entitled to a full legal accounting from Defendants of all the terms and conditions of all consideration, paid to or received by Chesapeake pursuant to the VPPs to determine how much is owed to McCall and the Class.

32

## COUNT THIRTEEN

### Request for Injunctive Relief

138.    Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

139.    McCall and the Class risk irreparable injury if Chesapeake is permitted to continue to deliver mineral reserves to the Bank Defendants pursuant to the terms of the VPPs.

140.    The subject matter of this case concerns real property interests of a unique nature making specific performance and injunctive relief appropriate.    Accordingly, McCall and the Class request permanent injunctive relief against Defendants.

## COUNT FOURTEEN

### Money Had and Received Against Chesapeake

141.    Plaintiff incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

142.    Chesapeake, upon receiving the VPP payments, received money belonging to McCall and the Class.

143.    Chesapeake benefitted from the receipt of the payments.

144.    Under the principles of equity and good conscience, Chesapeake should not be permitted to keep said payments.    The amount of the payments will be determined at trial.

## COUNT FIFTEEN

### Unjust Enrichment Against All Defendants

145.    Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

146.    The Bank Defendants purchased mineral reserves owned by McCall and the Class, and Chesapeake and the Bank Defendants failed to compensate McCall and the Class.

147.    McCall and the Class reasonably expected to be paid for their minerals.

148.    The Bank Defendants accepted deliveries of predetermined volumes of oil and/or gas production and benefitted from said deliveries.

149.    Chesapeake received compensation from the Bank Defendants for the deliveries of mineral reserves belonging to McCall and the Class.

150.    To allow the Bank Defendants to benefit from the deliveries of the predetermined volumes of oil and/or gas production without paying McCall and the Class would be unconscionable and result in the Bank Defendants being unjustly enriched.

151.    To allow Chesapeake to benefit from the payments by the Bank Defendants for the deliveries of mineral reserves belonging to McCall and the Class would be unconscionable and result in Chesapeake being unjustly enriched.

152.    Defendants have been unjustly enriched at the expense of McCall and the Class in an amount to be determined at trial.

## PRAYER FOR RELIEF

153.    Plaintiff Mary Linda McCall, on behalf of herself and the Class, demands judgment from Defendants for the following:

A.     An order certifying this case as a class action and appointing the Plaintiff and her counsel to represent the Class;

B.     A permanent order for injunctive relief enjoining Defendants from pursuing the policies, acts and practices complained of herein;

C.     A declaratory judgment stating that Defendants may not pursue the policies, acts and practices complained of herein;

D.     A full accounting from Defendants;

E.     An award of actual, exemplary, statutory, and/or punitive damages, as appropriate for the particular Cause of Action;

F.     Imposition of a constructive trust over any such damages award;

G.     Attorney's fees;

H.     Costs; and

I.     All prejudgment interest to which Plaintiffs will be entitled.

## JURY DEMAND

154.   Plaintiffs and the Class demand a trial by jury on all claims and issues so triable.

This the 24th day of November, 2010.

Respectfully Submitted By:

Joe R. Whatley, Jr.
Whatley Drake & Kallas
1540 Broadway, 37th Floor
New York, NY 10036
Telephone: 205-328-9576
Facsimile:   212-447-7077
Email: jwhatley@wdklaw.com

35

Britton D. Monts
(pro hac vice pending)
Heather E. Bridgers
(pro hac vice pending)
The Monts Firm
The Frost Bank Building
401 Congress Ave., Suite 1540
Austin, Texas 78701
Telephone: 512-382-6092
Facsimile: 512-692-2981
Email: bmonts@themontsfirm.com

Tom C. McCall
(pro hac vice pending)
David B. McCall
(pro hac vice pending)
The McCall Firm
2600 Via Fortuna, Suite 200
Austin, Texas 78746-7991
Telephone: (512) 477-4242
Facsimile: (512) 477-2271
Email: tmccall@themcallfirm.com

Richard E. Norman
(pro hac vice pending)
Crowley Norman LLP
Three Riverway, Suite 1775
Houston, Texas 77056
Telephone: 713-651-1771
Facsimile: 713-651-1775
Email:rnorman@crowleynorman.com