UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ x

MARY LINDA MCCALL, on behalf of herself and : 
all others similarly situated (collectively, "the :
Proposed Class"), :
 :
      - against - :
 :
CHESAPEAKE ENERGY CORP.; CHESAPEAKE :
EXPLORATION, L.L.C.; CHESAPEAKE LOUISIANA, :   Index No. 10 Civ. 8897 (DLC)
L.P.; CHESAPEAKE INVESTMENTS, L.P.; :   **ECF Case**
CHESAPEAKE APPALACHIA, L.L.C.; AUBREY K. :
MCCLENDON, individually and as sole general partner :
of Chesapeake Investments, L.P.; MS TELA, LLC; MS :
PERMIAN, LLC; MORGAN STANLEY; OBSIDIAN :
NATURAL GAS TRUST; WELLS FARGO :
DELAWARE TRUST COMPANY, NA; BARCLAYS :
CAPITAL, INC., A DIVISION OF BARCLAYS BANK :
PLC; ARGONAUT VPP, LLC; GS LOAN PARTNERS, :
A DIVISION OF THE GOLDMAN SACHS GROUP, :
INC.; SOONER GAS TRUST; WELLS FARGO & :
COMPANY AND WELLS FARGO SECURITIES, LLC, :
SUCCESSOR IN INTEREST TO WACHOVIA :
CAPITAL MARKETS, LLC; FALCON VPP LP; TW :
INVESTORS LLC; BLUE DEVIL TRUST; and DB :
ENERGY TRADING LLC, AN OPERATING :
SUBSIDIARY OF DEUTSCHE BANK AMERICAS :
HOLDING CORPORATION, and HIGH PLAINS GAS :
TRUST (collectively, "Defendants"). :

------------------------------------------------------------------ x

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
## MOTION TO DISMISS PLAINTIFF'S AMENDED CLASS ACTION COMPLAINT

Lawrence T. Gresser
Brett D. Jaffe
Daniel H. Tabak
**COHEN & GRESSER LLP**
800 Third Avenue, 21st Floor
New York, New York 10022
(212) 957-7600 Main
(212) 957-4514 Fax
*Counsel for Chesapeake
Defendants*

Jesse R. Pierce
J. Chad Newton
**PIERCE & O'NEILL,
LLP**
4203 Montrose Blvd.
Houston, Texas 77006
(713) 634-3600 Main
(713) 634-3601 Fax
*Counsel for Chesapeake
Defendants*

Stephanie J. Goldstein
**FRIED, FRANK, HARRIS,
SHRIVER & JACOBSON LLP**
One New York Plaza
New York, New York 10004
(212) 859-8000 Main
(212) 859-4000 Fax
*Counsel for Banks*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

STATEMENT OF FACTS ..................................................................................................... 4

ARGUMENT ....................................................................................................................... 10

I. MCCALL LACKS STANDING TO ASSERT CLAIMS ARISING OUT OF JOAS TO WHICH SHE IS NOT A PARTY AND PROPERTY IN WHICH SHE HAS NO INTEREST ................................................................................................................. 11

II. MCCALL'S IMPROPER GROUP PLEADING DISREGARDS THE CORPORATE FORM....................................................................................................................... 14

III. MCCALL'S BREACH OF CONTRACT CLAIMS FAIL BECAUSE THE VPPS DO NOT SELL UNPRODUCED MINERALS BELONGING TO MCCALL ................................. 15

    A. By Their Express Terms, The VPPs Relate Only To Chesapeake's Share Of Production. ...................................................................................................... 17

    B. The Clear Terms Of The Provisions McCall Cites Do Not Establish A Breach. . 19

        1. The "Waiver of Partition" Provisions of the JOA Do Not Preclude the VPPs.................................................................................................. 19

        2. The "Maintenance of Unit Ownership" Provision Does Not Preclude the VPPs................................................................................................... 20

        3. McCall's Conclusory Allegations Regarding VPP Expenses Cannot Support Her Claim. .......................................................................... 22

        4. McCall's "Overproduction" Claim is Meritless. ..................................... 23

    C. McCall's Breach Of Contract Claim Against The Banks Has No Merit. ............. 23

IV. THE AMENDED COMPLAINT FAILS TO STATE A CLAIM FOR CONVERSION (COUNT THREE)....................................................................................................... 24

V. MCCALL CANNOT BRING A FRAUDULENT CONCEALMENT CLAIM (COUNT FIVE)......................................................................................................................... 26

    A. Fraudulent Concealment Is Not A Cognizable Claim Under Texas Law............. 26

    B. McCall Has Failed to Allege the Existence of an Underlying Tort ...................... 27

    C. McCall's Fraudulent Concealment Claim Is an Improper Attempt to Recast Her Breach of Contract Claim In Tort ....................................................................... 27

VI.   MCCALL HAS NOT STATED A CONSPIRACY CLAIM (COUNTS IV AND VI) ....... 28

VII.  MCCALL'S CLAIM FOR AN ACCOUNTING MUST BE DISMISSED (COUNT SEVEN) ................................................................................................................... 29

CONCLUSION ................................................................................................................ 31

# TABLE OF AUTHORITIES

## Federal Cases

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*
    651 F. Supp. 2d 155 (S.D.N.Y. 2009) ..................................................................... 11

*Bell Atl. Corp. v. Twombly* 550 U.S. 544 (2007) ............................................... 10, 22, 23

*Brassco, Inc. v. Klipo*
    No. 99 Civ. 3014, 2006 WL 223154 (S.D.N.Y. Jan. 27, 2006) .............................. 25

*Cassese v. Washington Mut., Inc.*
    262 F.R.D. 179 (E.D.N.Y 2009) ..................................................................... 12, 13

*Castle v. United States*
    301 F.3d 1328 (Fed. Cir. 2002) ............................................................................. 12

*Chambers v. Time Warner, Inc.*
    282 F.3d 147 (2d Cir. 2002) ................................................................................. 10

*Chill v. General Elec. Co.*
    101 F.3d 263 (2d Cir. 1996) ................................................................................. 28

*Collins v. West Hartford Police Dept.*
    324 F. App'x 137 (2d Cir. 2009) .......................................................................... 13

*Cortec Indus., Inc. v. Sum Holding L.P.*
    949 F.2d 42 (2d Cir. 1991) ............................................................................. 10-11

*Druyan v. Jagger*
    508 F. Supp. 2d 228 (S.D.N.Y. 2007) .................................................................. 15

*Gebhardt v. Allspect, Inc.*
    96 F. Supp. 2d 331 (S.D.N.Y. 2000) ...................................................................... 4

*Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*
    230 F.3d 549 (2d Cir. 2000) ................................................................................. 16

*H.S.W. Enterprises, Inc. v. Woo Lae Oak, Inc.*
    171 F. Supp. 2d 135 (S.D.N.Y. 2001) .................................................................. 26

*In re Elevator Antitrust Litig.*
    502 F.3d 47 (2d Cir. 2007) ................................................................................... 10

*In re Lehman Bros. Sec. and ERISA Lit.*
    684 F. Supp. 2d 485 (S.D.N.Y. 2010) .................................................................. 13

*In re Salomon Smith Barney Mut. Fund Fees Litig.*
    441 F. Supp. 2d 579 (S.D.N.Y. 2006) ................................................................. 13

*Kauffman v. Dreyfus Fund, Inc.*
    434 F.2d 727 (3d Cir. 1970) ............................................................................. 13

*Kirch v. Liberty Media Corp.*
    449 F.3d 388 (2d Cir. 2006) ............................................................................. 28

*Lane v. Page*
    649 F. Supp. 2d 1256 (D.N.M. 2009) ............................................................... 18

*Lewis v. Casey*
    518 U.S. 343 (1996) .................................................................................... 11, 12

*Matsushita Elec. Indus. Co. v. Epstein*
    516 U.S. 367 (1996) ......................................................................................... 16

*McTiernan v. Franklin*
    508 F.2d 885 (10th Cir. 1975) .......................................................................... 13

*Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*
    418 F.3d 168 (2d Cir. 2005) ............................................................................. 11

*O'Brien v. National Prop. Analyst Partners*
    936 F.2d 674 (2d Cir. 1991) ............................................................................. 28

*O'Shea v. Littleton*
    414 U.S. 488 (1974) ......................................................................................... 11

*Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd.*
    85 F. Supp. 2d 282 (S.D.N.Y. 2000) ........................................................... 15, 26

*Ramos v. Patrician Equities Corp.*
    765 F. Supp. 1196 (S.D.N.Y. 1991) .................................................................. 11

*Truk Int'l Fund LP v. Wehlmann*
    737 F. Supp. 2d 611 (N.D. Tex. 2009) .............................................................. 18

*W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*
    549 F.3d 100 (2d Cir. 2008) ............................................................................. 11

*Warth v. Seldin*
    422 U.S. 490 (1975) ......................................................................................... 11

## State Cases

*Abacus Federal Savings Bank v. Lim*
    75 A.D.3d 472 (1st Dep't 2010) ....................................................................... 28

*Advent Trust Co. v. Hyder*
    12 S.W.3d 534 (Tex. App. 1999)........................................................ 28

*Beshara v. Southern Nat. Bank*
    928 P.2d 280 (Okla. 1996)............................................................ 25

*Bourke v. Western Bus. Products, Inc.*
    120 P.3d 876 (Okla. Civ. App. 2005)................................................ 30

*Carone v. Retamco Operating, Inc.*
    138 S.W.3d 1 (Tex. App. 2004)...................................................... 27

*Cass v. Stephens*
    156 S.W.3d 38 (Tex. App. 2004)..................................................... 25

*Centex Corp. v. Dalton*
    840 S.W.2d 952 (Tex. 1992)......................................................... 30

*Chaparral Energy, L.L.C. v. Pioneer Exploration, Ltd.*
    241 P.3d 1161 (Okla. Civ. App. 2010) ...........................................25-26

*Clark v. Holmes*
    120 P. 642 (Okla. 1912)............................................................ 13

*Coolite Corp. v. Am. Cyanamid Co.*
    52 A.D.2d 486 (1st Dep't 1976) .................................................... 30

*Cox v. Lasley*
    639 P.2d 1219 (Okla. 1981).......................................................... 20

*De Mik v. Cargill*
    485 P.2d 229 (Okla. 1971)........................................... 8, 17, 18, 20

*Dernick Resources, Inc. v. Wilstein*
    312 S.W.3d 864 (Tex. App. 2009).............................................. 17, 24

*Diversified Bus. Servs., Inc. v. Corp. Fin. Opportunities, Inc.*
    946 P.2d 662 (Okla. 1997).......................................................... 16

*Drummond v. Johnson*
    643 P.2d 634 (Okla. 1982).......................................................... 13

*EOG Res., Inc. v. Department of Revenue*
    86 P.3d 1280 (Wyo. 2004)............................................................ 7

*ExxonMobil Corp. v. Valence Operating Co.*
    174 S.W.3d 303 (Tex. App. 2005).................................................... 21

*Four Bros. Boat Works, Inc. v. Tesoro Petroleum Cos.*
  217 S.W.3d 653 (Tex. App. 2006) ........................................................ 29

*Gaylord Entm't Co. v. Thompson*
  958 P.2d 128 (Okla. 1998) ................................................................. 29

*Hart v. Socony-Vacuum Oil Co.*
  291 N.Y. 13 (1943) ......................................................................... 24

*Houston Nat. Bank v. Biber*
  613 S.W.2d 771 (Tex. App. 1981) ........................................................ 25

*Holland v. Thompson*
  No. 08-08-0031-cv, --- S.W.3d ----, 2010 WL 3157148 (Tex. App. 2010) ........... 27

*Hunt v. Baldwin*
  68 S.W.3d 117 (Tex. App. 2001) ......................................................... 29

*Hydro Investors, Inc. v. Trafalgar Power, Inc.*
  6 A.D.3d 882, 775 N.Y.S.2d 402 (3d Dep't 2004) ................................... 31

*Jones v. Phipps*
  191 P.2d 196 (Okla. 1948) ................................................................ 24

*Kaplan v. Bank One Texas, N.A.*
  No. 05-00-01578-CV, 2001 WL 1263697 (Tex. App. Oct. 23, 2001) ................. 28

*Kingsley Arms, Inc. v. Sano Rubin Const. Co., Inc.*
  16 A.D.3d 813 (3d Dep't 2005) .......................................................... 30

*Lucio v. John G. and Marie Stella Kennedy Mem'l Found.*
  298 S.W.3d 663 (Tex. App. 2009) ....................................................... 26

*Markwardt v. Texas Indus., Inc.*
  325 S.W.3d 876 (Tex. App. 2010) ....................................................... 26

*MBF Clearing Corp. v. Shine*
  212 A.D.2d 478, 623 N.Y.S.2d 204 (1st Dep't 1995) ............................... 28-29

*MBL Life Assur. Corp. v. 555 Realty Co.*
  240 A.D.2d 375 (2d Dep't 1997) ......................................................... 25

*McCall v. Chesapeake Energy Corp.*
  164 P.3d 1120 (Okla. Civ. App. 2007) .................................. 2, 5, 10, 15, 16, 26

*New York Univ. v. Continental Ins. Co.*
  87 N.Y.2d 308, 639 N.Y.S.2d 283 (1995) .............................................. 28

*Peyton v. McCaslin*
    417 P.2d 316 (Okla. 1966) ................................................................. 31

*Pitco Prod. Co. v. Chaparral Energy, Inc.,*
    63 P.3d 541 (Okla. 2003) .................................................................... 21

*Pitts v. Southwestern Sales Corp.*
    65 P.2d 184 (Okla. 1936) .................................................................... 28

*Preferred Fuel Distribs., LP v. Amidhara, LLC*
    No. 10-08-00122-CV, 2010 WL 139308 (Tex. App. Jan. 13, 2010) .................. 26-27

*Pugh v. Hassell*
    242 P.2d 701 (Okla. 1952) .................................................................. 25

*Purnavel v. Tel-A-Car of N.Y., Inc.*
    204 A.D.2d 297, 611 N.Y.S.2d 599 (2d Dep't 1994) ................................. 28

*Sam P. McCullough, Inc. v. Doggett*
    54 P.2d 184 (Okla. 1936) .................................................................... 30

*Sanderson v. Yale Oil Ass'n*
    No. 106905, — P.3d —, 2010 WL 4913469 (Okla. Civ. App. Sep. 20, 2010) ........ 23

*Schindler v. Austwell Farmers Coop.*
    841 S.W.2d 853 (Tex. 1992) .......................................................... 27-28

*Sparks Bros. Drilling Co. v. Texas Moran Exploration Co.*
    829 P.2d 951 (Okla. 1991) .................................................................. 17

*State ex rel. Crawford v. American Std. Life & Accident Ins. Co.*
    37 P.3d 971 (Okla. Civ. App. 2001) ...................................................... 13

*Tanges v. Heidelberg North America, Inc.*
    93 N.Y.2d 48 (1993) ......................................................................... 26

*T.F.W. Mgmt, Inc. v. Westwood Shores Prop. Owners Ass'n*
    79 S.W.3d 712 (Tex. App. 2002) ........................................................... 31

*Thyroff v. Nationwide Mut. Ins. Co.*
    8 N.Y.3d 283, 832 N.Y.S.2d 873 (2007) ................................................. 26

*Vial v. Gas Solutions, Ltd.*
    187 S.W.3d 220 (Tex. App. 2006) ......................................................... 28

*Welty v. Martinaire of Okla., Inc.*
    867 P.2d 1273 (Okla. 1994) ........................................................... 25, 26

*XAE Corp. v. SMR Prop. Mgmt. Co.*
   968 P.2d 1201 (Okla. 1998) ............................................................................. 17, 18

**Statutes**

Bankruptcy Code, 11 U.S.C. § 101(42A) ................................................................... 7

Internal Revenue Code, 26 U.S.C. § 636 .................................................................. 7

12 OKLA. STAT. ANN. tit. 12, § 95(3) ..................................................................... 25

20 OKLA. STAT. ANN. tit. 20, § 30.5 ...................................................................... 10

V.T.C.A. § 16.003 (Texas) ..................................................................................... 25

**Regulations**

17 C.F.R. § 210.4-10(a)(26) .................................................................................... 18

**Rules**

Fed. R. Civ. P. 12(b)(6) ...................................................................................... 1, 10

Fed. R. Civ. P. 9(b) ........................................................................................... 1, 28

**Other Sources**

8 Patrick H. Martin & Bruce M. Kramer, *Williams & Meyers Oil and Gas Law,*
   *Manual of Terms* (2009) .......................................................................... 1, 6, 8

Gary B. Conine, Property Provisions of the Operating Agreement-Interpretation,
   Validity, and Enforceability, 19 Tex. Tech L. Rev. 1263, 1268-1370 (1988) .......................... 4

Defendants respectfully submit this memorandum of law in support of their Motion to Dismiss Plaintiff's Amended Class Action Complaint (the "Amended Complaint," cited herein as "Am. Compl.") with prejudice pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b).[1]

## PRELIMINARY STATEMENT

Plaintiff Mary Linda McCall ("McCall") and an affiliate of defendant Chesapeake Energy Corporation ("Chesapeake Energy") are working interest owners in oil and gas leases in Oklahoma that are governed by two joint operating agreements ("JOAs") that were executed in the 1970's.[2] Non-party Chesapeake Operating, Inc. ("Chesapeake Operating") is the operator under the JOAs, and McCall, along with other putative class members, is a non-operating working interest owner. The JOAs, as described further herein, permit the working interest owners to take and dispose of oil and gas produced from certain wells located in Beckham County, Oklahoma, in accordance with each working interest owner's proportionate, fractional interest under the applicable JOA.

Through her Amended Complaint in this putative class action, McCall now challenges the right of working interest owners in the JOAs to sell overriding royalty interests (here denominated "volumetric production payments" and referred to as "VPPs") affecting only their own share of oil and gas production. At its core, McCall's Amended Complaint is simply the

---

[1] Chesapeake Energy Corp., Chesapeake Exploration, L.L.C., Chesapeake Louisiana, L.P., Chesapeake Investments, L.P., Chesapeake Appalachia, L.L.C., Aubrey K. McClendon, individually and as sole general partner of Chesapeake Investments, L.P. (collectively, the "Chesapeake Defendants"), MS Tela, LLC, MS Permian, LLC, Morgan Stanley, Obsidian Natural Gas Trust, Wells Fargo Delaware Trust Company, NA, Barclays Capital, Inc., a division of Barclays Bank PLC, Argonaut VPP, LLC, GS Loan Partners, a division of The Goldman Sachs Group, Inc., Sooner Gas Trust, Wells Fargo & Company and Wells Fargo Securities, LLC, successor in interest to Wachovia Capital Markets, LLC, Falcon VPP LP, TW Investors LLC, Blue Devil Trust, and DB Energy Trading LLC, an operating subsidiary of Deutsche Bank Americas Holding Corporation and High Plains Gas Trust (collectively, "the Banks," together with the Chesapeake Defendants, "Defendants").

[2] A working interest is "[t]he operating interest under an oil and gas lease," and the working interest owner has the exclusive right to exploit the minerals on the land. 8 Patrick H. Martin & Bruce M. Kramer, *Williams & Meyers Oil and Gas Law, Manual of Terms*, 1158 (2009). Relevant portions of the *Manual of Terms* are attached as Exhibit A to the Affirmation of Brett D. Jaffe ("Jaffe Aff."), which was filed on February 14, 2011 (docket # 43).

latest in a series of attempts to inject herself into financing transactions to which she is not party so that she may realize financial benefits to which she is not entitled. Her first effort, in the Oklahoma courts, ended with a dispositive, precedential ruling that the express terms of the JOAs governing McCall's working interests did not require Chesapeake Operating to market McCall's share of oil and gas production for her benefit. *McCall v. Chesapeake Energy Corp.*, 164 P.3d 1120 (Okla. Civ. App. 2007). In doing so, the Oklahoma courts recognized that each JOA explicitly allows all working interest owners to dispose of their own share of production without incurring any liability to the other parties to that JOA.

To avoid the preclusive effect of the Oklahoma court's ruling, McCall filed suit in this Court, alleging in her original complaint that the VPP transactions between the Chesapeake Defendants and the Banks resulted in the sales of *unproduced minerals in the ground* that belong to all working interest owners, rather than *produced minerals*. But the express language of the relevant agreements makes it clear that this is pure fiction. By definition, the overriding royalty interests sold to the Banks pursuant to the VPPs attach only to a Chesapeake entity's share of oil and gas after being severed from the ground and produced, and the Banks assume the complete risk that the relevant Chesapeake entity can deliver the requisite production quotas from its own interest.

Rather than defend her original set of allegations against dismissal, McCall has now amended her complaint. Citing a single provision of the VPPs and Chesapeake Energy's SEC disclosures, McCall now claims that because the VPP transactions involve a Chesapeake entity's transfer to the Banks of "real property" interests, this somehow amounts to the sale of minerals in the ground, rather than post-production reserves. McCall's allegations, however, run afoul of decades of oil and gas law and are not supported by the language McCall cites. First, as the

Oklahoma Supreme Court has unequivocally recognized, an overriding royalty interest is an interest in real property, *not in real estate*, and attaches only once oil or gas is removed from the ground. Second, Chesapeake Energy's SEC disclosures make plain that, in connection with the VPPs, the relevant Chesapeake entity is selling only its own "proved reserves." A term of art in the oil and gas industry, "proved reserves" references only that which the *Chesapeake* entity expects (with greater than 90% certainty) to realize upon production. Simply stated, the Chesapeake entity only transferred that which it owns outright under the JOAs — its share of produced oil and gas; the VPPs do not implicate, impinge, or otherwise damage McCall's interest.

McCall's additional allegations are similarly unavailing. For example, she continues to ignore critical language in the JOAs establishing that a signatory's rights and obligations are a function of its proportionate fractional interest and that it is largely free to do what it wants with its share of production. Instead, McCall incorrectly relies on a "Waiver of Rights to Partition" provision and a "Maintenance of Unit Ownership" provision in the JOAs. But neither of those clauses in any way restricts a working interest owner's right to dispose of its proportionate share of oil and gas. *See infra* at pp. 19-22.

In addition, McCall's Amended Complaint fails to state any cognizable claim because McCall:

- Does not have standing to bring any claims on behalf of unnamed class members who are parties to the thousands of JOAs to which she is not a party and with respect to which she has no injury, *see infra* Section I;

- Purports to assert claims against various Chesapeake and Bank entities and affiliates without regard to those parties' actual conduct and in complete disregard of the corporate form, *id.* Section II-III;

- Purports to assert fraudulent concealment and conversion claims that are not cognizable here, *id.* Sections IV-V;

- Purports to assert a general conspiracy claim without pleading any cognizable underlying tort, *id.* Section VI; and

- Purports to assert a claim for an accounting based on an audit provision of the JOA that McCall has never invoked as required. *Id.* Section VII.

In short, McCall's claims ignore the plain language of the relevant contracts and are contrary to the settled law of every applicable jurisdiction. The Amended Complaint should be dismissed in its entirety, with prejudice.

## STATEMENT OF FACTS[3]

***The Parties.*** The Chesapeake Defendants are engaged in the business of exploring for, and producing, oil and gas from properties within the United States. Am. Compl. ¶¶ 34-35. In this pursuit, the Chesapeake Defendants frequently enter into oil and gas leases with landowners. *Id.* ¶ 35. Those leases permit the Chesapeake Defendants to explore for, produce and market oil and gas from lands covered by the lease. *Id.* ¶ 34.

In some circumstances, the Chesapeake Defendants (like virtually all other oil and gas development companies) share the costs of development of a leased area with other parties, pursuant to Joint Operating Agreements ("JOAs"), with one party acting as the Operator and the others being "non-operating working interest owners." *Id.* ¶ 41. JOAs often derive from model forms routinely used in the oil and gas industry to provide for the joint development and operation of mineral properties. *Id.* ¶ 42.[4]

---

[3] Solely for purposes of this motion, all well-pled allegations of fact are assumed to be true. However, conclusory allegations and legal conclusions are not entitled to any presumption of truth. *See Gebhardt v. Allspect, Inc.* 96 F. Supp. 2d 331, 333 (S.D.N.Y. 2000) ("[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss.") (internal quotation and editing marks and citation omitted).

[4] For a general discussion of JOAs and their key provisions, *see* Gary B. Conine, *Property Provisions of the Operating Agreement-Interpretation, Validity, and Enforceability*, 19 Tex. Tech L. Rev. 1263, 1268-1370 (1988). Since 1956, a model form operating agreement, prepared and sanctioned by the American Association of Petroleum Landmen ("AAPL"), has been accepted and used in the oil and gas industry. Am. Compl. ¶ 42. Although there have been four versions of the form, the JOAs to which McCall is a party are the original 1956 version.

Although McCall asserts claims relating to thousands of JOAs, *id*. ¶ 83, she is only a party to two JOAs with Chesapeake entities, covering oil and gas leases and interests in specific lands, *i.e*., the Unit Areas, located in Beckham County, Oklahoma. *Id.* ¶ 4; *see also* Jaffe Aff., Ex. B at cover page; *id*. Ex. C at cover page.[5] The two JOAs to which McCall is a party have a total of a dozen signatories, most of whom are themselves oil and gas producers. *Id*. Ex. B at "Exhibit A"; *id*. Ex. C at "Revised Exhibit A." None of those other signatories is directly complaining here, and McCall's fractional interest in both JOAs is less than 1%. *Id*.

**The JOAs at Issue.** Pursuant to the JOAs, Chesapeake Operating, although not a party here, acts as Operator for benefit of all signatories to the agreements. Am. Compl. ¶ 39; *McCall*, 164 P.3d at 1122 (recognizing Chesapeake Operator as the operator under the JOAs). The rights and obligations of each of the parties to the JOA are "several," not "joint," according to each party's fractional interest in the JOA. For instance, the JOAs expressly provide that:

- Each party to the JOA is entitled (i) to receive a *proportionate* share of oil and gas produced from the Unit Area covered by the JOA and (ii) is responsible for taking and disposing of that production in the manner it sees fit (*id*., Exs. B-C § 13);[6]

- Each party bears responsibility for its share of costs for equipment and materials and is entitled to its share of production in accordance with its fractional interest (*id*., Exs. B-C, § 4 ("Interests of Parties")), and, thus McCall (who holds less than a 1% fractional interest in both JOAs) is responsible for that percentage of the operating costs, and likewise is only entitled to receive that percentage of the oil and gas produced from those wells subject to her JOAs (*id*., Exs. B-C, § 8); and,

---

[5] The two JOAs were executed in 1973 and 1979. The only differences between those JOAs relevant to this action are certain typewritten provisions found in Section 31, "Other Conditions." Those differences will be identified and discussed herein where appropriate.

[6] Section 13 of the JOAs provides as follows: "Right to Take Production in Kind. Each party shall take in kind or separately dispose of its proportionate share of all oil and gas produced from the Unit Area . . . . Each party shall pay or deliver, or cause to be paid or delivered, all royalties, overriding royalties, or other payments due on its share of such production, and shall hold other parties free from any liability therefor. . . . Each party shall execute all division orders and contracts of sale pertaining to its interest in production from the Unit Area, and shall be entitled to receive payment direct from the purchaser or purchasers thereof for its share of all production."

- Each party whose interest becomes subject to "an overriding royalty, production payment, or other charge . . . shall assume and alone bear all such excess obligations and shall account for them to the owners thereof *out of its share* of the working interest production of the Unit Area." *Id.*, Exs. B-C § 4 (emphasis added).

Critically — and again reflecting the "several," rather than "joint," nature of the rights and obligations embedded in the JOAs — a party is *expressly permitted* to transfer a portion of its *pro rata* interest in production from the Unit Area to another entity at any point after the JOAs are entered. Specifically, the Subsequently Created Interests provisions of the JOAs provide that:

> [I]f any working interest owner shall, subsequent to the execution of this agreement, create an overriding royalty, production payment, net proceeds interest, carried interest or any other interest out of its working interest (hereinafter called "subsequently created interest"), such subsequently created interest shall be specifically made subject to all the terms and provisions of this agreement.

*Id.*, Ex. B § 31(b); *see also id.*, Ex. C § 31(b) (substantively identical). Consistent with all of these provisions – and contrary to McCall's baseless characterization of the JOAs as "joint venture agreements," Am. Compl. ¶¶ 38, 41 – the parties affirmatively disclaim that the JOAs create any partnership rights:

> *The liability of the parties shall be several, not joint or collective*. Each party shall be responsible only for its obligations and shall be liable only for its proportionate share of the costs of developing and operating the Unit Area . . . . It is not the intention of the parties to create, nor shall this agreement be construed as creating, a mining or other partnership or association, or to render them liable as partners.

*Id.*, Exs. B-C § 22 (emphasis added). Thus, notwithstanding the denomination of the operating agreement as "joint," the rights of each party to the JOA to produced minerals — and the owner's ability to dispose of them — are separate, not joint, and are based solely on the owner's fractional interest as set forth in the JOAs. Martin & Kramer, *supra* note 2, at 527.

*Volumetric Production Payments (VPPs).*  The Chesapeake Defendants sold Volumetric

Production Payments ("VPPs") to each of the Banks or one of their affiliates.  Am. Compl. ¶¶ 2,

68.  McCall is not a party to any of those VPPs.  Notwithstanding McCall's description of VPPs

as a "'Wall Street hedge fund meets traditional oil and gas industry'" union (Am. Compl. ¶ 51), a

VPP is a common form of oil and gas financing that has been used for decades and, far from

being nefarious, is expressly contemplated in the Internal Revenue and United States Bankruptcy

Codes.  Internal Revenue Code, 26 U.S.C. § 636; Bankruptcy Code, 11 U.S.C. § 101(42A); *see*

*EOG Res., Inc. v. Department of Revenue*, 86 P.3d 1280, 1282-83 (Wyo. 2004) (discussing

VPPs).

Under a VPP, the grantee of the production payment – here one of the Banks – receives a

portion of the working interest share of future production of the granter – here, a Chesapeake

entity – for a limited term, free of production costs in exchange for an upfront cash payment.

The principal transaction documents for each of the VPPs include a Purchase and Sale

Agreement ("PSA"), Conveyance of Term Overriding Royalty Interest ("Conveyance"), and Gas

and Oil Sales Agreement ("GOSA").[7]  The Amended Complaint alleges conclusorily that,

through the documents constituting the VPPs, McCall's "undivided share of unproduced mineral

reserves were improperly partitioned and sold" in violation of her rights as well as those of other

non-operating working interest owners.  Am. Compl. ¶ 2.

The clear, unequivocal language of the VPPs, however, expressly provide only for a

transfer of rights to minerals after they are extracted from the ground, and those transfers affect

---

[7]  The VPPs that relate to the wells identified in paragraph 4 of the Amended Complaint are: (i) a January 31, 2008 VPP sold by Chesapeake Investments, L.P.  to TW Investors LLC, the principal documents for which are attached to the Jaffe Affirmation as Ex. D; (ii) an August 1, 2008 VPP sold by Chesapeake Exploration, L.L.C. to Sooner Gas Trust, the principal documents for which are attached to the Jaffe Aff. as Ex. E, and (iii) an August 21, 2008 VPP sold by Chesapeake Investments, L.P. to Blue Devil Trust, the principal documents for which are attached to the Jaffe Aff. as Ex. F.  *See* Am. Compl. ¶¶ 68(f), (g), & (i).  The VPPs at issue also include guarantees, mortgages, and novation agreements to assure performance of the covenants included in the principal documents.

only the produced oil and gas attributable to the relevant Chesapeake entity's interests. Under

the Conveyances, a Chesapeake entity delivers to a Bank certain quantities of Production

Payment Hydrocarbons each month over a specified period "*as and when produced in the field*."

Jaffe Aff., Ex. D, Tab 2 § 2.2 (emphasis added); *id*. Exs. E-F, Tab 2 § 3.1. The Production

Payment Hydrocarbons are delivered at agreed-upon "Delivery Points" and then, pursuant to the

GOSAs, are sold back to the Chesapeake entity at market-based prices. *Id*., Ex. D-F, Tab 3 §

2.1. Consequently, and directly contrary to McCall's allegations that the VPPs in some

unexplained way affect "minerals in the ground" (Am. Compl. ¶¶ 2, 36, 57), the only actual

transfers relate to minerals once they have been "produced in the field." Jaffe Aff., Ex. D, Tab 2

§ 2.2; *id*. Exs. E-F, Tab 2 § 3.1.

Moreover, as specified in the Conveyances, the VPPs provide only for delivery of

produced minerals. The Granting Clause for each Conveyance specifically provides that the

Chesapeake entity at issue granted "a term overriding royalty interest (herein referred to as the

'Production Payment') *in and to the Subject Interests and in and to the Subject Hydrocarbons*

*attributable thereto* that is equal to and measured by the Production Payment Percentage . . . ."

Jaffe Aff., Exs. D-F, Tab 2 at 1 (emphasis added).[8] "Subject Interests" are expressly confined to

a Chesapeake entity's working interest:

> Working Interest Owner's [*i.e*., Chesapeake Defendant's] interests in and to (a)
> the Subject Wells and (b) the estates, titles, and rights granted under the Leases to
> the extent … [they] give Working Interest Owner the right and power to own,
> operate and maintain the Subject Wells and to capture, produce, receive, sell and
> otherwise dispose of Hydrocarbons produced from the well bores of the Subject
> Wells . . . .

---

[8] An "overriding royalty" is a percentage carved out of a lessee's working interest, free and clear of any expense
incident to the production and sale of the oil and gas produced from the leasehold. *See De Mik v. Cargill*, 485 P.2d
229, 232 (Okla. 1971) (citing Martin & Kramer, *supra* note 1, at 727).

*Id*., Exs. D & F, Tab 2 § 1.1(Conveyances).[9]  Likewise, the Conveyances provide that "the Production Payment shall be satisfied *solely* from Production Payment Hydrocarbons," (*id*. § 2.1 (emphasis added)), which are expressly limited to those hydrocarbons "that may be produced after the Effective Time from the Subject Wells that are attributable to the Subject Interests …" (the "Subject Hydrocarbons").  *Id*. § 1.1.

Thus, because the transfers under the Conveyances are limited to those hydrocarbons attributable to Chesapeake's interest in produced minerals, each Bank bears the risk that the relevant Chesapeake entity's share of production (the Production Payment Hydrocarbons) will suffice to satisfy that Chesapeake entity's delivery obligations under the VPP.  *Id*. § 2.1 ("Royalty Owner [the Bank] bears the risk that actual production" does not meet quotas).

Accordingly, when a Chesapeake entity sold a "Production Payment consisting of a term overriding royalty interest" to a Bank in exchange for a cash purchase price, the Banks did not purchase any interests beyond that Chesapeake entity's specified fractional interest of produced oil and gas.  *See also id*., Ex. D Tab 1 § 11.2; Exs. E-F, Tab 1 § 10.2 (PSAs).  ("Buyer [the Bank entity] will not [] own any rights to conduct or direct operations thereon or any tangible property interest therein or any equipment located thereon, all such rights, tangible property interests and equipment being retained by Seller [Chesapeake Defendant].").

***McCall's Prior, Unsuccessful Lawsuit Against the Chesapeake Entities***.  Prior to the present action, McCall brought a declaratory judgment action in Oklahoma against Chesapeake Energy and non-party Chesapeake Operating for a determination of the parties' rights and

---

[9]  "Subject Wells" were listed on property exhibits to the Conveyances.  The VPP that Chesapeake Exploration LLC executed with Sooner Gas Trust uses equivalent language to define "Subject Interests."  Jaffe Aff., Ex. E, Tab 2 § 1.1 (Conveyance).

obligations under the JOAs. *McCall*, 164 P.3d 1120.[10] There, McCall argued that she was entitled to participate in Chesapeake Operating's contracts to market and sell its proportionate share of production from the Subject Wells, which is what the VPP transactions do. Both the district court and appellate court rejected McCall's argument. Germane to the issues raised herein, the Oklahoma Court of Civil Appeals held: "[McCall] cannot elect to share in Chesapeake Operating's contract for the sale of production from those wells" subject to her JOAs. *Id.* at 1126. The court therefore affirmed what the JOAs make clear: Chesapeake Operating may dispose of its own proportionate share of production with no obligation whatsoever to McCall. In addition, the Oklahoma court rejected McCall's effort "to disregard the separate corporate identities of Chesapeake Operating and [Chesapeake Energy Corporation]" by bringing its claims against Chesapeake Energy, a stranger to the JOAs. *Id.* at 1127.

## ARGUMENT

While the Court assumes as true all well-pleaded facts, the Amended Complaint must proffer "enough facts to state a claim to relief that is plausible on its face;" a Rule 12(b)(6) motion should be granted where the plaintiffs have failed to "nudge[] their claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *accord In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (citing *Twombly*, 550 U.S. at 570). In deciding a Rule 12(b)(6) motion, the Court may consider the facts alleged in the complaint, documents attached thereto as exhibits, and documents incorporated by reference therein. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002); *Cortec Indus., Inc. v. Sum*

---

[10] The *McCall* decision, which was published by order of the Oklahoma Supreme Court, is accorded the precedential weight of an Oklahoma Supreme Court decision. *See* 20 OKLA. STAT. ANN. tit. 20, § 30.5.

*Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991). Accordingly, this Court may consider the terms of the relevant JOAs and VPPs. Am. Compl. ¶¶ 43, 68; Jaffe Aff., Exs. B-G; Tabak Decl., Ex. A.

## I.  MCCALL LACKS STANDING TO ASSERT CLAIMS ARISING OUT OF JOAS TO WHICH SHE IS NOT A PARTY AND PROPERTY IN WHICH SHE HAS NO INTEREST

McCall must have standing to assert the entirety of each claim in the Amended Complaint against each Defendant — a requirement that cannot be circumvented by her styling of the Amended Complaint as a class action. *See Ramos v. Patrician Equities Corp.*, 765 F. Supp. 1196, 1199 (S.D.N.Y. 1991) ("A plaintiff, including one who is seeking to act as class representative, must have individual standing to assert the claims in the complaint against each defendant being sued by him."). As the Supreme Court has explained:

> That a suit may be a class action . . . adds nothing to the question of standing, for *even named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.*

*Lewis v. Casey*, 518 U.S. 343, 357 (1996) (emphasis added) (quotation marks and citations omitted).[11] Moreover, "[w]here, as here, jurisdiction is predicated on diversity of citizenship, a plaintiff must have standing under both Article III of the Constitution and applicable state law in order to maintain a cause of action." *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 173 (2d Cir. 2005).

Here, McCall alleges that her claims are "based on alleged breaches of standard form oil and gas joint operating agreements" that purportedly violated the rights of all non-operating

---

[11] *See also O'Shea v. Littleton*, 414 U.S. 488, 494 (1974) ("[I]f none of the named plaintiffs purporting to represent a class establishes the requisite case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class.") (footnote omitted); *W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*, 549 F.3d 100, 106 n.5 (2d Cir. 2008) (same) (citation omitted); *Warth v. Seldin*, 422 U.S. 490, 499 (1975) (plaintiff will only have Article III standing "to redress or otherwise to protect against injury to the complaining party . . . ."); *Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, 651 F. Supp. 2d 155, 175 (S.D.N.Y. 2009) ("Standing is a threshold question for any case brought before a federal court, regardless of whether plaintiffs bring the case as a class action.") (footnote omitted).

working interest owners in thousands of JOAs. Am. Compl. ¶ 2. But McCall — the sole named plaintiff in this putative class action — acknowledges that she is only a party to two of the JOAs at issue. *Id*. ¶ 4. Those JOAs have different terms (*see infra* at p. 19) and relate solely to four wells in Beckham County, Oklahoma that are subject to only "three of the VPPs described in the Complaint," not the ten VPPs that she attempts to place at issue. Am. Compl. ¶ 97; *see also id*. ¶¶ 68 (a), (b), (c), (d), (i) & (j) (describing VPPs relating to wells not located in Oklahoma); Jaffe Aff., Exs. B-C.[12] McCall, who self-evidently has sustained no injury stemming from JOAs to which she is not a party and thus has no rights, *see id*. ¶¶ 4, 89, 101, can only attempt to bring claims with respect to her own JOAs. *See*, *e.g.*, *Castle v. United States*, 301 F.3d 1328, 1338-39 (Fed. Cir. 2002) (only parties to contract at issue had standing to bring claims and non-parties, despite claiming to be beneficiaries, had no standing to sue); *Cassese v. Washington Mut., Inc.*, 262 F.R.D. 179, 184 (E.D.N.Y 2009) ("[A] class action plaintiff does not have standing to sue defendants for a breach of contract to which the plaintiff was not a party.").

Attempting to create standing where there is none, McCall contends that she can bring claims under the thousands of JOAs to which she is not a party

> because all ten of the VPPs are structured the same way and use the same documents, [so] the harm suffered by McCall is the same harm suffered by all other working interest owners in the Class.

Am. Compl. ¶ 4. Even if the factual predicate of McCall's allegation was correct — it plainly is not, as the VPPs encompass different wells in different states with different parties and contain different terms, *compare* Jaffe Aff., Ex. D, *id.* Ex. E and *id.* Ex. F — McCall's contention is wrong. A plaintiff must "personally have been injured" to have standing (*Lewis*, 518 U.S. at 357), and whether another putative class member may have been injured as a result of different

---

[12] Although the Argonaut-Goldman Sachs VPP and the High Plains-Wells Fargo VPP cover wells in Oklahoma, they do not cover any wells in Beckham County. Jaffe Aff., Ex. G, Tab 1 (list of wells covered by Argonaut VPP); Tabak Decl., Ex. A (list of wells covered by High Plains VPP).

JOAs and VPPs is irrelevant. *See, e.g., Collins v. West Hartford Police Dept.*, 324 F. App'x 137, 139 (2d Cir. 2009) (plaintiff had no standing to sue for injuries to his mother's property interests); *Cassese*, 262 F.R.D. at 183-84 (named plaintiffs lacked standing to bring class claims under consumer protection laws and for breach of contract, unjust enrichment and fraud against defendants who did not loan money to named plaintiffs); *Kauffman v. Dreyfus Fund, Inc.*, 434 F.2d 727, 734-37 (3d Cir. 1970) (plaintiff's standing limited to four mutual funds he owned and did not extend to sixty-one other "similarly situated" funds); *In re Salomon Smith Barney Mut. Fund Fees Litig.,* 441 F. Supp. 2d 579, 607-08 (S.D.N.Y. 2006) (dismissing for lack of standing purported class claims relating to sixty-eight funds in which named plaintiffs had no shares); *In re Lehman Bros. Sec. and ERISA Lit.*, 684 F. Supp. 2d 485, 491 (S.D.N.Y. 2010) (no standing arising out of securities offerings in which named plaintiffs were not purchasers).[13]

For these reasons, McCall does not have standing to bring any claims — whether styled in contract or tort — concerning thousands of JOAs, covering wells in at least eight states (and seven VPPs), to which she is not a party. *See* Am. Compl. ¶¶ 2, 89, 101. Accordingly, all of McCall's claims relating to VPPs other than those to which TW Investors LLC, Sooner Gas Trust and Blue Devil Trust are parties must be dismissed because those are the only VPPs that touch upon wells operated under the JOAs to which she is a party. Likewise, the Banks that are not parties to those VPPs – Morgan Stanley, Wells Fargo Delaware National Trust Co., NA, Barclays Capital, Inc., a division of Barclays Bank plc, GS Loan Partners, a division of the

---

[13] Application of settled Oklahoma law mandates the same result. Absent a party's status as an express third-party beneficiary (not alleged here), a non-party to a contract may not seek to enforce rights arising out of that contract. *See Drummond v. Johnson*, 643 P.2d 634, 639 (Okla. 1982) ("[C]ontracts are binding only upon those who are parties thereto, and are enforceable only by the parties to a contract. . .") (footnote omitted). Likewise, a plaintiff does not have standing under Oklahoma law to assert property rights regarding a property in which the plaintiff has no interest. *See McTiernan v. Franklin*, 508 F.2d 885, 888 (10th Cir. 1975) (plaintiff lacking a "vested property right . . . has no standing" to sue) (citing *Clark v. Holmes*, 120 P. 642 (Okla. 1912)); *State ex rel. Crawford v. American Std. Life & Accident Ins. Co.*, 37 P.3d 971, 974 (Okla. Civ. App. 2001) (stockholders of insolvent insurance company had no property right in a claim held by the receiver and thus no standing to intervene).

Goldman Sachs Group, Inc., Wells Fargo & Co., Wells Fargo Securities LLC (successor in interest to Wachovia Capital Markets, LLC), and Deutsche Bank Americas Holding Corp. – must be dismissed.

## II.    MCCALL'S IMPROPER GROUP PLEADING DISREGARDS THE CORPORATE FORM

For transparently tactical reasons, McCall lumps five corporate entities and one individual into a single entity — "Chesapeake" (Am. Compl. ¶ 1) — and makes her allegations against this fictional entity rather than against the separate defendants, without any allegations suggesting these separate entities are so intertwined as to effectively be one entity.

Rather, McCall's only effort to address the corporate form in her Amended Complaint is to allege that Chesapeake Energy "knew about" the VPP transactions:

> As the CEO of Chesapeake, McClendon is a vice-principal of Chesapeake [and] the sole general partner of Chesapeake Investments LP, the VPP seller in [two VPPs]  These two VPPs were entered into with express knowledge, consent, and involvement of Chesapeake Energy Corp, and Chesapeake is jointly and severally liable for all damages sustained by McCall and the Class as a result of McClendon's conduct in entering into self-serving VPPs through Chesapeake Investments LP.

Am. Compl. ¶ 75.  Leaving aside the contradictory and overlapping definitions,[14] these allegations do not meet the Oklahoma test for piercing the corporate veil, as the Oklahoma courts previously held in rejecting McCall's effort to disregard the corporate form in her prior action. Specifically, in the prior Oklahoma case, McCall named Chesapeake Operating, the operator of the wells, as a defendant but also improperly sought to name Chesapeake Energy, the publicly-owned corporate parent.  Applying governing Oklahoma corporate law, the Oklahoma court rejected McCall's effort to disregard the corporate form without proof that Chesapeake

---

[14] "McClendon" is alternately defined to mean either the person, Aubrey McClendon, Am. Compl. ¶ 73, or "Chesapeake Investments, LP, of which McClendon is the sole general partner (collectively referred to as 'McClendon.'"  *Id.* ¶ 74.

Operating and Chesapeake Energy were so inextricably intertwined as to be effectively one entity. *McCall*, 164 P.3d at 1127.

Nor do the pleading rules in federal court permit a plaintiff to lump defendants together without specifying their separate involvement in the purported causes of action. *See*, *e.g.*, *Druyan v. Jagger*, 508 F. Supp. 2d 228, 236 (S.D.N.Y. 2007) (dismissing contract claims where "plaintiff consistently lumps the defendants together in her arguments; yet there is no factual allegation in the complaint that would allow this court, or any trier of fact, to conclude that they are or ought to be treated as a single entity."); *Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd.*, 85 F. Supp. 2d 282, 293 (S.D.N.Y. 2000) ("When fraud is alleged against multiple defendants, a plaintiff must plead with particularity by setting forth separately the acts or omissions complained of by each defendant.").

Similarly, McCall groups all of the Banks together, completely ignoring that some of them are not parties to the VPPs and are not proper parties under her class action lawsuit. As McCall alleges, Chesapeake entities entered into the VPPs with "special purpose entities" that were created for the specific purpose of the VPP transaction. Am. Compl. ¶¶ 32, 67-68. It was not the actual banks, but these special purposes entities that are parties and signatories to the VPPs.[15] Therefore, Barclays Capital, Wells Fargo, Goldman Sachs, Deutsche Bank and Morgan Stanley are not proper defendants in this action, and must be dismissed.

## III. MCCALL'S BREACH OF CONTRACT CLAIMS FAIL BECAUSE THE VPPS DO NOT SELL UNPRODUCED MINERALS BELONGING TO MCCALL

As the Oklahoma courts explained in rejecting McCall's prior action against Chesapeake Operating, the JOAs permit each party to market and sell its own portion of oil and gas once

---

[15] Jaffe Aff., Ex. D, Tab 1 at 1 (Purchase and Sale Agreement between Chesapeake Investments and "TW Investors LLC, a Delaware limited liability company"); *id*. Ex. E, Tab 1 at 1 (PSA between Chesapeake Exploration and "Sooner Gas Trust, a Delaware statutory trust"); *id*. Ex. F, Tab 1 at 1 (PSA Between Chesapeake Investments and "Blue Devil Trust, a Delaware statutory trust").

severed from the ground and produced — as the Chesapeake Defendants do through the VPPs — without sharing the proceeds with the other working interest owners who, like McCall, are not party to a marketing agreement. *McCall*, 164 P.3d 1120;[16] Am. Compl. ¶ 55 (conceding that minerals are personal property once produced). That judgment cannot be revisited here. *See Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 375 (1996) (looking to law of state of original case to determine claim or issue preclusive effect of judgment in that state on claims in federal court); *Diversified Bus. Servs., Inc. v. Corp. Fin. Opportunities, Inc.*, 946 P.2d 662, 666-68 (Okla. 1997) (holding that issue preclusion barred plaintiff from re-litigating issue involving many of the same facts, the same plaintiff, and similar theories of recovery as in a previous case for which there was a final judgment).

Paying lip service to the Oklahoma judgment against her, McCall acknowledges that there is nothing inherently improper about creation of "production payment[s]" or "overriding royalt[ies]." Am. Compl. ¶ 50. Nor is any other conclusion warranted, as the JOAs – which create several, not joint obligations – expressly contemplate that each working interest owner can create overriding royalties burdening its working interests for use as a financing tool, as the Oklahoma courts have already found in analyzing the exact JOAs at issue. *McCall*, 164 P.3d at 1126. For instance, and contrary to McCall's claim (Am. Compl. ¶ 44), Section 31(b) of the JOAs allows a working interest owner to convey a "subsequently created interest," *i.e.*, an "overriding royalty" or "production payment" carved out of its "working interest." Jaffe Aff., Exs. B-C § 31(b). The JOAs further provide that if any party's interest becomes subject to

> an overriding royalty, production payment, or other charge . . . such party shall assume and alone bear all such excess obligations and shall account for them to

---

[16] Because the relevant VPPs contain Oklahoma choice-of-law provisions, they are governed by Oklahoma law, which is where the properties are located. *Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*, 230 F.3d 549, 556 (2d Cir. 2000). Oklahoma law also applies to the JOAs which govern rights to real property in Oklahoma. *See McCall*, 164 P.3d at 1125 (applying Oklahoma law).

the owners thereof *out of its share of the working interest production of the Unit Area.*

*Id.*, Exs. B-C § 4 (emphasis added). Likewise, Section 13 of the JOAs (which McCall does not mention at all) specifically provides that "[e]ach party shall take in kind or separately dispose of *its proportionate share of all oil and gas produced* from the Unit Area" and "shall pay or deliver, or cause to be paid or delivered, all royalties, overriding royalties, or other payments *due on its share of such production*, and shall hold other parties free from any liability therefor." *Id.*, Exs. B-C § 13 (emphasis added).[17]

To avoid application of the previous, issue-preclusive Oklahoma ruling, McCall crafts a new theory: the VPPs partition and sell minerals in the ground jointly owned by all working interest owners as co-tenants, rather than an interest in oil and gas of a Chesapeake entity after they are severed from the ground and produced. McCall's latest argument ignores the plain language of the agreements and misstates fundamental tenets of oil and gas law.

**A.      By Their Express Terms, The VPPs Relate Only To A Chesapeake Entity's Share Of Production.**

As described *supra* at 8, the VPPs granted "term overriding royalty interest[s]" to the Banks. Jaffe Aff., Exs. D-F, Tab 1 at 1 (PSAs). While an overriding royalty interest is considered an interest in real property (but not in real estate), *De Mik v. Cargill*, 485 P.2d 229, 231-2 (Okla. 1971), "[t]he nature of an overriding royalty interest is such that it attaches only when oil and gas are reduced to possession." *XAE Corp. v. SMR Prop. Mgmt. Co.*, 968 P.2d 1201, 1207 (Okla. 1998); *accord De Mik*, 485 P.2d at 233. Indeed, the VPP transaction documents are clear that any transfers are of Production Payment Hydrocarbons "*as and when*

---

[17] Given these provisions, McCall's characterization of the JOAs as "joint venture agreements" (Am. Compl. ¶ 38) is particularly misleading. Unlike a JOA where the working interest owners maintain separate ownership of their working interests, and take in kind separately rather than jointly, in a joint venture agreement the ownership of a working interest is joint. *Dernick Resources, Inc. v. Wilstein*, 312 S.W.3d 864, 869 (Tex. App. 2009) (explaining that the relationship of venturers "was that of co-owners"); *cf. Sparks Bros. Drilling Co. v. Texas Moran Exploration Co.,* 829 P.2d 951, 953 (Okla. 1991) ("An operating agreement in itself does not create a mining partnership.").

*produced in the field.*" Jaffe Aff., Ex. D, Tab 2 § 2.2 (emphasis added); Exs. E-F Tab 2 § 3.1

(Conveyances).

Because an overriding royalty interest owner only has an interest in the oil and gas after

production, the royalty interest owner does not, contrary to McCall's allegations, obtain an

interest in the minerals in the ground. *XAE Corp.,* 968 P.2d at 1206*; De Mik*, 485 P.2d at 233-

34. Likewise, the VPP Conveyances confirm that the VPPs transfer only interests in oil and gas

belonging to a Chesapeake entity once produced, and not those of other working interest owners

like McCall because the Production Payment Hydrocarbons that are transferred are solely

"attributable to the Subject Interests …," *i.e.,* those of a Chesapeake entity, not other parties to

the JOAs. Jaffe Aff., Exs. D-F, Tab 2 § 1.1; *see supra* at 8-9.

McCall points to Chesapeake Energy's description of the VPPs in its SEC filings —

which reference the sale of "reserves" to suggest that Chesapeake Energy considered the VPPs to

involve the sale of minerals in the ground belonging to non-working interest owners. Am.

Compl. ¶ 72. This is not the case. As a predicate matter, each of the disclosures shows on its

face that the VPPs only impacted a Chesapeake entity's own interest, as the disclosures

repeatedly reference "our proved reserves" or "our proved reserves and production." Moreover,

the word "reserves" is "oil industry jargon for the estimated quantity of reasonably recoverable

oil and gas in mineral properties." *Truk Int'l Fund LP v. Wehlmann,* 737 F. Supp. 2d 611, 614-

15 (N.D. Tex. 2009); *accord Lane v. Page,* 649 F. Supp. 2d 1256, 1293-94 (D.N.M. 2009)

("reserves" is a term "of art in the oil and gas industry" referring to "estimated quantities of

crude oil, natural gas, and natural gas liquids which geological and engineering data demonstrate

with reasonable certainty to be recoverable in future years.") (internal quotation marks and

citation omitted). Similarly, the SEC defines reserves as the "estimated remaining quantities of

oil and gas and related substances anticipated to be economically producible." 17 C.F.R. §

210.4-10(a)(26). Once again, the meaning and effect of the VPP is clear: the relevant

Chesapeake entity is transferring to the Banks an interest in its estimated future production, to be

delivered only once those reserves are actually produced; there is no transfer of minerals in the

ground implicated, and the Banks explicitly take the risk that the Chesapeake entity will not be

able to deliver the estimated production from its own interest. *See supra* at p. 9.

### B. The Clear Terms Of The Provisions McCall Cites Do Not Establish A Breach.

McCall's breach of contract allegations are wholly inconsistent with the plain language of

the JOAs themselves. Here, McCall alleges that the Defendants breached the JOAs with McCall

and the Class in four ways:

> (1) by attempting a unilateral partition and sale of part of the minerals in the ground for Chesapeake's and McClendon's sole benefit; (2) by failing to maintain uniformity of ownership among all co-tenants; (3) by burdening the Class with the cost of delivery, transportation, and other expenses attributable to the VPPs; and (4) by failing to account for and pay a portion of the VPP proceeds to McCall and the Class despite its contractual and common law duty to do so.

Am. Compl. ¶¶ 101, 107. These allegations are based on provisions in the JOAs that McCall

claims "prohibit an operator, such as Chesapeake, from purporting to sell for its exclusive benefit

a portion of the mineral reserves in the ground under a leasehold estate." *Id*. ¶ 44; *accord id.* ¶

99 (substantially similar). Even if VPPs affected minerals in the ground as McCall erroneously

claims (they decidedly do not, *see supra* at pp. 17-19), the terms of the relevant provisions are

inconsistent with her claims.

### 1. The "Waiver of Partition" Provisions of the JOA Do Not Preclude the VPPs.

Only one of the JOAs to which McCall is a party contains a "Waiver of Partition"

provision. Jaffe Aff., Ex. B § 31(c). That provision states that "[e]ach party hereto owning an

undivided interest in the Unit Area waives any and all rights it may have to partition and have set aside to it in severalty its undivided interest therein." *Id.* (emphasis added.)

A partition is a legal action by which co-tenants divide the property they own as co-tenants into separate parcels that would each be owned separately. *Cox v. Lasley*, 639 P.2d 1219, 1220 (Okla. 1981); *De Mik*, 485 P.2d at 234-35. Thus, the "Waiver of Partition" says that the working interest owners under the JOAs waive their rights to seek a partition of the Unit Area into separate sections to be individually owned. Jaffe Aff., Ex. B § 31(c). That provision of the JOA does not purport to address the disposition of gas (whether in the ground or produced), nor does it purport to preclude the creation of overriding royalty interests or production payments (both of which are expressly contemplated by the JOA). *See, e.g., id.* Exs. B-C §§ 4, 13, 31(b). Thus, by the plain language of the document, McCall's claim that the provision "specifically prohibit[s] one co-tenant (the operator) from attempting to unilaterally partition and sell for its own benefit less than all of its interest in the oil and gas still in the ground (in the well reservoir or formation) because to do so would necessarily change the ownership percentages among the working interest owners" (Am. Compl. ¶ 45) is wholly unsubstantiated.

2.  The "Maintenance of Unit Ownership" Provision Does Not Preclude the VPPs.

The Maintenance of Unit Ownership provision of the JOAs provides that:

> For the purpose of maintaining uniformity of ownership in the oil and gas leasehold interests covered by this contract, and notwithstanding any other provisions to the contrary, *no party shall sell, encumber, transfer or make other disposition of its interest in the leases embraced within the Unit Area and in wells, equipment, and production* unless such disposition covers either: (1) the entire interest of the party in all leases and equipment and production; or (2) an equal undivided interest in all leases and equipment and production in the Unit Area.

Jaffe Aff., Exs. B-C § 20 (emphasis added).

First, by its terms, the Maintenance of Unit Ownership provision applies only when a party seeks to dispose of its interest "in *all* leases *and* equipment *and* production." *Id*. (emphasis added). McCall does not allege that any Chesapeake entity transferred any interests in equipment, and the VPPs make plain that the relevant Chesapeake entities are not transferring their working interests under the JOAs. In fact, the VPP PSAs expressly provide that the Chesapeake entities retain — and do not transfer to the Banks — all their tangible property interests and its interest in equipment. *Id*., Ex. D, Tab 1 § 11.2; *id*., Exs. E-F, Tab 1 § 10.2. As a result, the VPPs do not violate the Maintenance of Unit Ownership provision. Under the plain language of the JOAs, the Maintenance of Unit Ownership provision is not implicated when a working interest owner carves a term overriding royalty from its proportionate share of oil and gas production.

Second, contrary to McCall's claims that the provision prohibits a sale for the sole benefit of the seller, by its express terms, the Maintenance of Unit Ownership provision requires only that a party's disposition of "its interests in the leases embraced within the Unit Area," conveys either (i) its entire interest or (ii) an equal undivided percent of its interest. *Id*., Exs. B-C § 20. This provision has been construed to require "that conveyances are to be made so as to maintain the same ratio of ownership throughout the unit area." *Pitco Prod. Co. v. Chaparral Energy, Inc.*, 63 P.3d 541, 544 (Okla. 2003); *accord ExxonMobil Corp. v. Valence Operating Co.*, 174 S.W.3d 303, 313-14 (Tex. App. 2005). Notwithstanding that the VPPs do not affect the interests of oil and gas in the ground, the Maintenance of Unit Ownership provision plainly permits a party to sell its working interest, *i.e.*, its right to explore for and produce oil and gas, so long as it is a sale of the party's entire interest or of an equal undivided percentage of its interest throughout the Unit Area. *See* Am. Compl. ¶ 46 ("The JOAs allow Chesapeake to sell and

assign the entirety of its interest in a lease or group of leases to another oil and gas company (such sales occur regularly in the industry).") As such, McCall's claim that any disposition had to be for the benefit of all working interest owners (*id*.) is belied by the plain language of the JOAs.[18]

In addition, McCall claims the provision imposes unique prohibitions on "one co-tenant (the operator)." Am. Compl. ¶ 45. But the provision never refers to the Operator, much less singles out the Operator for specific prohibitions. McCall's contrary allegation appears to have been created out of whole cloth.

> 3.　　McCall's Conclusory Allegations Regarding VPP Expenses
> 　　　Cannot Support A Claim.

McCall conclusorily alleges "upon information and belief" that Chesapeake Operating allocated operating costs and other expenses of the VPPs to other working interest owners. Am. Compl. ¶¶ 80, 101. While not nearly sufficient to support her claim, this allegation is fundamentally implausible. McCall admits that she received monthly statements of expenses, *id*. ¶¶ 40, 145, and the VPPs themselves detail the monthly production being delivered to the Banks. *See, e.g*., Jaffe Aff., Exs. D-E, Tab 2 (Conveyance, Schedule 1 "Scheduled Quantities"). If McCall's monthly statements demonstrated an increase in expenses associated with the VPPs, McCall could and would have pled them. She did not. McCall's bald allegations of increased expenses — that she had the means to verify if true — do not cross the line from conceivable to plausible. *Twombly*, 550 U.S. at 570.

---

[18]  While the Mortgages in the VPPs grant a security interest in all of the Chesapeake entity's interests in the Unit Area, they do not offend the Maintenance of Unit Ownership provision for that very reason. In the event of a foreclosure on that mortgage, the Bank would step into the Chesapeake entity's shoes; the uniformity of ownership percentages would not be impacted at all. *See* Jaffe Aff., Ex. D, Tab 5 § 1.2 (Grant of Security Interest to TW Investors LLC); *id*. § 4.4 (Foreclosure); *id*., Ex. E, Tab 5 § 1.2 (Grant of Security Interest to Sooner Gas Trust); *id*. § 4.2 (Foreclosure); *id*., Ex. F, Tab 5 § 1.2 (Grant of Security Interest to Blue Devil Trust); *id*. § 4.2 (Foreclosure).

4. <u>McCall's "Overproduction" Claim is Meritless</u>.

In a throwaway paragraph unconnected to the other allegations in her Amended Complaint, McCall alleges solely "[o]n information and belief" that "Chesapeake also is overproducing the wells covered by the VPPs, including those in which McCall owns a working interest, resulting in severe production imbalances . . . ." Am. Compl. ¶ 102.[19] McCall, however, does not proffer a single factual allegation supporting the allegation. She does not name any wells that are overproduced, nor does she allege that she has been unable to market and sell her own proportionate share of the production from any wells. Plainly, McCall's allegations do not plead "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 555-56. As a result, McCall has not alleged a breach of contract claim based on "overproduction."

**C.   McCall's Breach Of Contract Claim Against The Banks Has No Merit.**

Although the Banks are not parties to the JOAs, McCall asserts a breach of contract claim against the Banks (Count II) based on the allegations that "[t]he Bank Defendants became bound by the [JOAs] once they entered into the VPP contracts." Am. Compl. ¶ 106; *see also id.* ¶ 105 ("By entering into the VPP transactions with Chesapeake and McClendon, the [Banks] became subject to and bound by the terms of the JOAs . . . just as Chesapeake and McClendon are bound by those JOAs.").

First, because there was no breach of the JOAs (*see supra* Section II), no claim could ever lie against the Banks for breach. Second, McCall's entirely conclusory allegation that the VPPs resulted in the Banks becoming bound under the JOAs is belied by the transaction

_____

[19] "Overproduction" occurs when a working interest owner sells more than its proportionate share of production, and, accordingly, another owner sells less than its proportionate share. *See, e.g., Sanderson v. Yale Oil Ass'n,* 246 P.3d 1109, 1109 (Okla. Civ. App. 2010).

23

documents. Not a single provision in the VPP documents suggests in any way that the Banks assumed any obligation under the JOAs.[20] To the contrary, as shown *supra* at pp. 6-9, the Banks disclaimed as much. Instead, the VPPs simply contemplate the sale to the Banks of an overriding royalty interest in a Chesapeake entity's share of oil and gas under a JOA *subsequent to production* and have absolutely no impact on McCall's rights or the rights of any other non-working interest owner.

Contrary to McCall's allegations (*see* Am. Compl. ¶ 60), *Dernick Resources, Inc. v. Wilstein*, 312 S.W.3d 864, 881 (Tex. App. 2009), is not otherwise. In that case, unlike here, the parties had entered into a joint venture agreement — not a standard form operating agreement like the ones here specifically disclaiming joint venture obligations, *see supra* at p. 6 — that expressly provided that any production payment would be "subordinate to this [joint venture agreement] and to any applicable Operating Agreement." *Id.* at 869 (internal quotation marks omitted). Thus, in *Dernick*, the court concluded that "the *VPP agreement* was subject to the provisions in the [joint venture agreement] and JOA" (*id.* at 881, emphasis in original), not, as McCall claims, that the VPP buyer became bound by a JOA it had not signed. Am. Compl. ¶ 60.

## IV. THE AMENDED COMPLAINT FAILS TO STATE A CLAIM FOR CONVERSION (COUNT THREE)

McCall alleges that, through the VPPs, Defendants unlawfully converted her right to the proceeds of the sale of both (i) "mineral reserves in the ground" (Am. Compl. ¶ 110) and (ii) produced oil and gas delivered to the Banks. *Id.* ¶¶ 114, 116. As a preliminary matter, the conversion claim rests entirely on a putative contractual breach and is thus not actionable. *See*

---

[20] Under both Oklahoma and New York law, McCall cannot sue the Banks for allegedly breaching contracts to which they are not parties. *See, e.g., Jones v. Phipps*, 191 P.2d 196, 197 (Okla. 1948) (holding that broker could not assert breach-of-contract claim against purchaser when only contract at issue was between seller and prospective purchaser, and broker was not party to that agreement); *Hart v. Socony-Vacuum Oil Co.*, 291 N.Y. 13, 17 (1943) (holding that "[e]ven where [an assignee] covenants that his assignment is to be 'subject' to the terms of the lease, that language, without more definite words of promise, does not make him liable as by privity of contract.").

*Beshara v. Southern Nat. Bank*, 928 P.2d 280, 290 (Okla. 1996) (holding that viable claim of conversion exists only where "conduct may have been so onerous that much more than a mere breach of conduct occurred"); *MBL Life Assur. Corp. v. 555 Realty Co.*, 240 A.D.2d 375, 376 (2d Dep't 1997) ("It is settled . . . that a claim of conversion cannot be predicated on a mere breach of contract."); *Cass v. Stephens*, 156 S.W.3d 38, 62 (Tex. App. 2004) (holding that a conversion claim existed independent of a breach of contract claim only where the defendant had "breached an obligation that exists independent of the JOAs").

Moreover, the premise of McCall's claim is wrong. As described *supra* at pp. 8-10, the VPPs only transfer a Chesapeake entity's share of production; they do not affect in any way McCall's own interests in oil, gas and other minerals. Because the VPPs do not impact McCall's working interest, she is not deprived of anything, and no claim for conversion can possibly lie. *See Pugh v. Hassell*, 242 P.2d 701, 702 (Okla. 1952) (upholding judgment denying conversion claim where plaintiff did not exercise dominion or control over defendant's property).[21]

Additionally, only specifically identifiable, tangible personal property may be converted. *Welty v. Martinaire of Oklahoma, Inc.*, 867 P.2d 1273, 1275 (Okla. 1994) ; *Brassco, Inc. v. Klipo*, No. 99 Civ. 3014, 2006 WL 223154, at *20 (S.D.N.Y. Jan. 27, 2006) ("[M]oney must be specifically identifiable and segregated" to be subject of conversion claim) (internal quotation and editing marks omitted); *Houston Nat. Bank v. Biber*, 613 S.W.2d 771, 774 (Tex. App. 1981) (conversion of money lies only for specific coins or notes). But mineral reserves in the ground are not personal property. *Chaparral Energy, L.L.C. v. Pioneer Exploration, Ltd.*, 241 P.3d

---

[21] Except with respect to the statute of limitations, the potentially applicable laws of New York, Texas and Oklahoma are substantially the same with respect to this claim, and therefore, for present purposes, it is not necessary to engage in a choice-of-law analysis. Nonetheless, Defendants note that insofar as Texas law applies, the conversion claim would be subject to a two-year statute of limitations (V.T.C.A. § 16.003), and McCall's claim would be barred in its entirety in that her claim was first raised on November 24, 2010, more than 2 years after the VPPs that affect her wells were created. *See* Am. Compl. ¶¶ 68 (f), (g), (i). The same result would obtain in Oklahoma. 12 Okla. Stat. Ann. § 95(3).

1161, 1164 (Okla. Civ. App. 2010) (holding that oil and gas do not become personal property, and thus subject to conversion, until produced and severed from the leasehold).[22]  Although produced oil and gas constitutes personal property, the Oklahoma courts have already dispositively held that McCall has no rights of participation in any Chesapeake entity's share of production.  *McCall*, 164 P.3d at 1126.  *A fortiori*, she also has no rights to the proceeds of those reserves.  *Welty*, 867 P.2d at 1275 ("If [defendant] did not pay [plaintiff] all she had coming when it was due, then a debt came into existence under the contract.  One may not maintain a tort action in conversion to satisfy a debt.").  Under all of McCall's theories, her conversion claim should be dismissed.

## V.  MCCALL CANNOT BRING A FRAUDULENT CONCEALMENT CLAIM (COUNT FIVE)

### A.  Fraudulent Concealment Is Not A Cognizable Claim Under Texas Law

Because McCall is a Texas resident, Texas law presumptively governs her fraudulent concealment claim.[23]  But, under Texas law, fraudulent concealment is not an independent tort; instead, it is a doctrine used to toll the statute of limitations as to a separate tort claim. *Markwardt v. Texas Indus., Inc.*, 325 S.W.3d 876, 894 (Tex. App. 2010) ("The fraudulent-concealment doctrine is an affirmative defense to the statute of limitations."); *Preferred Fuel Distribs., LP v. Amidhara, LLC*, No. 10-08-00122-CV, 2010 WL 139308, at *2 n.2 (Tex. App. Jan. 13, 2010) (noting that fraudulent concealment is not an independent cause of action under

---

[22]  *See also Lucio v. John G. and Marie Stella Kennedy Mem'l Found.*, 298 S.W.3d 663, 672 (Tex. App. 2009) (no conversion of real property); *cf. Thyroff v. Nationwide Mut. Ins. Co.*, 8 N.Y.3d 283, 288-90, 832 N.Y.S.2d 873, 876-77 (2007) (same).

[23]  Under New York's applicable choice-of-law rules (*Tanges v. Heidelberg North America, Inc.*, 93 N.Y.2d 48, 54 (1993)), "fraud claims are governed by the state in which the injury is deemed to have occurred, which is usually where the plaintiff is located."  *Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd.*, 85 F. Supp. 2d 282, 292 (S.D.N.Y. 2000) (internal quotation marks and citations omitted); *accord H.S.W. Enterprises, Inc. v. Woo Lae Oak, Inc.*, 171 F. Supp. 2d 135, 142 (S.D.N.Y. 2001) (noting that "New York courts consider the locus of a fraud to be the place where the injury was inflicted," *i.e.*, where plaintiffs are domiciled).

Texas law); *Carone v. Retamco Operating, Inc.*, 138 S.W.3d 1, 10 (Tex. App. 2004)

("Fraudulent concealment is a doctrine relating to a statute of limitations defense and is not an

independent cause of action."). McCall concedes as much, contending that "McCall and the

Class have been damaged by Chesapeake's fraudulent concealment so as to toll the running of

limitations." Am. Compl. ¶ 141.

### B.   McCall Has Failed to Allege the Existence of an Underlying Tort

Under Texas law, fraudulent concealment requires the existence of an actionable

underlying tort. *See Holland v. Thompson*, No. 08-08-0031-cv, --- S.W.3d ----, 2010 WL

3157148, at *9 (Tex. App. 2010) ("[S]ince the record does not support the existence of an

underlying tort, the doctrine of fraudulent concealment does not apply . . . ."). The only tort

McCall alleges in her Amended Complaint is conversion, but as described *supra* at Section IV,

that claim is not actionable. Accordingly, McCall's fraudulent concealment claim cannot

survive.

### C.   McCall's Fraudulent Concealment Claim Is an Improper Attempt to Recast Her Breach of Contract Claim In Tort

Even were fraudulent concealment an independent tort, McCall's fraudulent concealment

claim rests entirely on allegations that the Chesapeake Defendants breached their contractual

duty to disburse proceeds from the VPPs to McCall and the Class for their "portion of the

mineral reserves" belonging to them, and failed to apprise her of that. Am. Compl. ¶ 136. That

is just another way of saying that the Chesapeake Defendants diverted a portion of their reserves

in alleged breach of the JOAs; adding words like "conceal" and "secretly," as McCall

conclusorily does throughout her Amended Complaint (*see, e.g., id.* ¶¶ 124, 138), does not

convert her breach of contract claim into a tort. *See Schindler v. Austwell Farmers Coop.*, 841

S.W.2d 853, 854 (Tex. 1992) (reversing judgment for plaintiff on fraud claim based solely on

breach of contract); *New York Univ. v. Continental Ins. Co.,* 87 N.Y.2d 308, 316, 639 N.Y.S.2d 283, 288 (1995) ("[W]here a party is merely seeking to enforce its bargain, a tort claim will not lie."); *Purnavel v. Tel-A-Car of N.Y., Inc.,* 204 A.D.2d 297, 297, 611 N.Y.S.2d 599, 600 (2d Dep't 1994) ("[A] cause of action sounding in fraud does not lie where the claim is based upon the same allegations as give rise to a breach of contract cause of action.") (citation and internal quotation marks omitted); *see also Pitts v. Southwestern Sales Corp.*, 65 P.2d 184, 185-86 (Okla. 1936) ("As a general rule, there must be some active negligence or misfeasance to support tort. There must be some breach of duty distinct from breach of contract.") (citation and quotation marks omitted).[24]

## VI.    MCCALL HAS NOT STATED A CONSPIRACY CLAIM (COUNTS IV AND VI)

No potentially applicable law recognizes a claim for civil conspiracy in the absence of an actionable underlying tort.  *See Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401 (2d Cir. 2006); *Abacus Federal Savings Bank v. Lim*, 75 A.D.3d 472, 474 (1st Dep't 2010) ("[A] cause of action sounding in civil conspiracy cannot stand alone, but stands or falls with the underlying tort.") (internal quotation marks and citation omitted); *MBF Clearing Corp. v. Shine*, 212 A.D.2d 478,

---

[24] Even if a fraudulent concealment claim were cognizable, McCall does not plead the requisite elements of one with particularity, as required by Federal Rule of Civil Procedure 9(b).  For instance, McCall uses words like "conceal" and "secretly" (Am. Compl. ¶¶ 124, 138), but she actually alleges that the Chesapeake Defendants "described the [VPP] transactions in [their] SEC filings" (*id.* ¶ 72), making her scienter allegations wholly implausible, in addition to conclusory.  *O'Brien v. Nat'l Prop. Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991) (citations and internal quotation marks omitted) ("[W]hile Rule 9(b) permits scienter to be demonstrated by inference, this must not be mistaken for license to base claims of fraud on speculation and conclusory allegations."); *see also Chill v. General Elec. Co.*, 101 F.3d 263, 267 (2d Cir. 1996).  Likewise, McCall's conclusory allegation that she "reasonably relied on Chesapeake's and its CEO McClendon's concealment and failure to disclose that it had sold a portion of the mineral reserves belonging to McCall and the Class" (Am. Compl. ¶ 140) is insufficient, even had the VPP transactions not been disclosed in public filings.  *Vial v. Gas Solutions, Ltd.*, 187 S.W.3d 220, 231 (Tex. App. 2006) (no fraudulent concealment where the plaintiff "would have discovered the allegedly misleading nature of [defendant's] recital if [she] had exercised due diligence"); *Kaplan v. Bank One Texas, N.A.*, No. 05-00-01578-CV, 2001 WL 1263697, at *5 (Tex. App. Oct. 23, 2001) (reliance not reasonable where the allegedly concealed wrongdoing was a matter of public record and plaintiff was not prevented from discovering her injury); *Advent Trust Co. v. Hyder*, 12 S.W.3d 534, 542 (Tex. App. 1999) (same).

478, 623 N.Y.S.2d 204, 205 (1st Dep't 1995) (same).[25]  As McCall does not state a claim for any purported tort upon which her conspiracy claims are based (*see supra* Sections IV-V), her conspiracy claim must be dismissed.

## VII.  MCCALL'S CLAIM FOR AN ACCOUNTING MUST BE DISMISSED (COUNT SEVEN)

McCall requests that this Court order:

> a full legal accounting from Defendants of all the terms and conditions of all consideration paid to or received by [all Defendants] pursuant to the VPPs, and the monthly volumes of oil and gas produced and delivered to the Bank Defendants under the VPPs to determine how much is owed to McCall and the Class.

Am. Compl. ¶ 151.  But the underlying basis of this claim does not rest under the VPPs (to which McCall is not a party) — it lies in a purported books and records requirements in the JOAs.  *Id*. ¶ 149 (alleging that the JOAs imposed upon "Chesapeake" a "contractual duty to maintain books and records of the lease operations," and that class members "also have audit rights under the JOAs.").

McCall does not identify a single provision in the JOAs obligating a Chesapeake entity "to maintain books and records of the lease operations."  Nor is there one.[26]  While McCall also references the audit provision in the JOAs, that provision has not been triggered.  The audit provision provides that:

> A Non-Operator, <u>upon notice in writing to Operator and all other Non-Operators</u>, shall have the right to audit Operator's accounts and records relating to the

[25]  Application of Oklahoma or Texas law mandates the same result.  *Four Bros. Boat Works, Inc. v. Tesoro Petroleum Cos.*, 217 S.W.3d 653, 668 (Tex. App. 2006) ("There is no independent liability for civil conspiracy. . . . [T]o prevail on a civil conspiracy claim, the plaintiff must show that the defendant was liable for some underlying tort."); *Hunt v. Baldwin*, 68 S.W.3d 117, 133 (Tex. App. 2001) (dismissing civil conspiracy claim where underlying tort claim was also dismissed); *Gaylord Entm't Co. v. Thompson*, 958 P.2d 128, 148 n.86 (Okla. 1998) ("A conspiracy between two or more persons to injure another is not enough; an underlying unlawful act is necessary to prevail on a civil conspiracy claim.").
[26]  At most, there is a contractual obligation for Chesapeake Operating to "maintain detailed records of Controllable Material" (Ex. B (Exhibit C at 6 (VII. Inventories) to July 2, 1973 JOA); Ex. C (Exhibit C at 5 (V. Inventories) to the Apr. 5, 1979 JOA)), which is identified as personal property, equipment and supplies. Ex. B (Exhibit C at 1 (Definitions) to July 2, 1973 JOA); Ex. C (Exhibit C at 1 (Definitions) to the Apr. 5, 1979 JOA).

accounting hereunder for any calendar year within the twenty-four (24) month period following the end of such calendar year . . . .

Ex. B (Exhibit C ¶ 5 to July 2, 1973 JOA); Ex. C (Exhibit C ¶ 5 to the Apr. 5, 1979 JOA) (emphasis added). McCall, however, does not (and cannot) allege that she made any written request for an audit or that Chesapeake Operating failed to comply with such a request. Because McCall has pled neither a required condition precedent to Chesapeake Operating's contractual performance nor a breach by failure to perform, she cannot assert a claim based on a breach of the audit provision. *See Sam P. McCullough, Inc. v. Doggett*, 54 P.2d 184, 189 (Okla. 1936) ("The law is that where a promise is conditioned upon the happening of a future event, the occurrence of such event is essential to the duty to perform."); *Bourke v. Western Bus. Products, Inc.*, 120 P.3d 876, 883 (Okla. Civ. App. 2005) (obligation dependent on fulfillment of condition precedent until the condition is not binding until condition is fulfilled); *Kingsley Arms, Inc. v. Sano Rubin Const. Co., Inc.*, 16 A.D.3d 813, 815 (3d Dep't 2005) (where notice is condition precedent to contract claim, to "failure to strictly comply [with the notice provision] is a waiver of [the] claim"); *Coolite Corp. v. Am. Cyanamid Co.*, 52 A.D.2d 486 (1st Dep't 1976) (holding that plaintiff's concession that it "never gave written notice . . . considered in conjunction with [plaintiff's acceptance of subsequent deliveries" precluded it from obtaining relief on the contract); *Centex Corp. v. Dalton*, 840 S.W.2d 952, 956 (Tex. 1992) (reversing trial court and holding that defendant's contractual performance was excused because condition precedent to performance had not been met).[27]

In any event, even if McCall had triggered the audit process, McCall's claim for an accounting under the JOAs does not provide her with a right to delve into payments under the

---

[27] In any event, McCall cannot bring her accounting claim on behalf of other working interest owners on hundreds of other JOAs who have not requested audits, nor can she assert her accounting claim against any Defendants that are not parties to the JOAs. *See supra* at pp. 11-14.

VPPs to which she is, concededly, not a party. *Hydro Investors, Inc. v. Trafalgar Power, Inc.*, 6 A.D.3d 882, 886, 775 N.Y.S.2d 402, 405 (3d Dep't 2004) (an accounting action requires the existence of a specific duty requiring the defendant to conduct an accounting for the plaintiff); *see T.F.W. Mgmt, Inc. v. Westwood Shores Prop. Owners Ass'n*, 79 S.W.3d 712, 719 (Tex. App. 2002) (holding that claim for accounting should be denied where there was no duty entitling plaintiff to accounting); *cf. Peyton v. McCaslin*, 417 P.2d 316, 320 (Okla. 1966) (requiring evidence of duty owed to plaintiffs before permitting an action for accounting). An accounting simply determines whether each working interest owner was afforded the opportunity to take their proportionate share of production, and has nothing to do with McCall's self-proclaimed right to a "portion of the VPPs proceeds." Am. Compl. ¶ 149.

<u>**CONCLUSION**</u>

Pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b), Defendants respectfully request that the Court dismiss the complaint in its entirety, with prejudice.

Respectfully submitted,

By:     /s/Lawrence T. Gresser
    Lawrence T. Gresser
    ltgresser@cohengresser.com
    Brett D. Jaffe
    bjaffe@cohengresser.com
    Daniel H. Tabak
    dtabak@cohengresser.com
    **COHEN & GRESSER LLP**
    800 Third Avenue, 21st Floor
    New York, New York  10022
    (212)  957-7600  Main
    (212)  957-4514  Fax

    Jesse R. Pierce
    jrpierce@jrp-assoc.com
    (admitted pro hac vice)
    J. Chad Newton
    cnewton@jrp-assoc.com
    (admitted pro hac vice)

**PIERCE & O'NEILL, LLP**
4203 Montrose Blvd.
Houston, Texas 77006
(713) 634-3600 Main
(713) 634-3601 Fax

*Counsel for Chesapeake Defendants*

Stephanie J. Goldstein
stephanie.goldstein@friedfrank.com
**FRIED, FRANK, HARRIS, SHRIVER &
JACOBSON LLP**
One New York Plaza
New York, New York 10004
(212) 859-8000 Main
(212) 859-4000 Fax

*Counsel for Banks*