UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------- X
                                        :
MARY LINDA MCCALL, on behalf of         :
herself and others similarly situated,  :      10 Civ. 8897 (DLC)
                                        :
                     Plaintiff,         :      OPINION AND ORDER
                                        :
           -v-                          :
                                        :
CHESAPEAKE ENERGY CORP., et al.,        :
                                        :
                     Defendants.        :
                                        :
--------------------------------------- X

APPEARANCES:

For plaintiff:
Joe R. Whatley, JR.
Whatley, Drake & Kallas, LLC
1540 Broadway, 37th Floor
New York, NY 10036

David B. McCall
Tom C. McCall
The McCall Firm
2600 Via Fortuna, Suite 200
Austin, TX 78746

Britton D. Monts
Heather E. Bridgers
The Monts Firm
The Frost Bank Building
401 Congress Ave. Suite 1540
Austin, TX 78701

Richard E. Norman
Crowley Norman LLP
Three Riverway, Suite 1775
Houston, TX 77056

For the Chesapeake Defendants:
Brett D. Jaffe
Daniel Hershel Tabak
Lawrence Thomas Gresser

Cohen & Gresser, LLP
800 Third Avenue 21st, Floor
New York, NY 10022

Jesse R. Pierce
Chad Newton
Jesse R. Pierce & Associates, P.C.
4203 Montrose Boulevard
Houston, TX 77006

For the Bank Defendants:
Stephanie J. Goldstein
Gregg L Weiner
Fried, Frank, Harris, Shriver & Jacobson
One New York Plaza
New York, NY 10004


DENISE COTE, District Judge:

Plaintiff Mary Linda McCall ('McCall") brought this
purported class action against the defendants[1] ("Defendants") on
November 24, 2010.  In the amended complaint filed on March 18,
2011 ("Complaint"), McCall alleged claims for breach of
contract, conversion, civil conspiracy to commit conversion, and
accounting.[2]  The Defendants filed a motion to dismiss the

---

[1]    The defendants are: Chesapeake Energy Corp.; Chesapeake
Exploration, LLC; Chesapeake Louisiana, LP; Chesapeake
Investments, LP; Chesapeake Appalachia, LLC; Aubrey K. McClendon
(collectively, the "Chesapeake Defendants"); MS Tela, LLC; MS
Permian, LLC; Morgan Stanley; Obsidian Natural Gas Trust; Wells
Fargo Delaware Trust Company, NA; Barclays Capital, Inc.;
Argonaut VPP, LLC; GS Loan Partners; Sooner Gas Trust; Wells
Fargo & Company; Wells Fargo Securities, LLC; Falcon VPP LP; TW
Investors LLC; Blue Devil Trust; DB Energy Trading LLC; and High
Plains Gas Trust (collectively, the "Bank Defendants").

[2]    The Complaint also lists claims for fraudulent concealment
and civil conspiracy to commit fraudulent concealment, but
McCall conceded that these claims were "not asserted as an

Complaint on April 8, 2011.  The motion was fully submitted on May 13.  For the following reasons, the motion to dismiss is granted.


BACKGROUND

    The following facts are taken from the plaintiff's complaint unless otherwise noted, and assumed to be true for the purposes of this motion.  <u>LaFaro v. New York Cardiothoracic Group, PLLC</u>, 570 F.3d 471, 475 (2d Cir. 2009).  McCall is a non-operating working interest owner[3] in several wells (the "McCall Wells") located in Beckham County, Oklahoma and operated by a non-defendant affiliate of the Chesapeake Defendants, identified by the Defendants as Chesapeake Operating LLC ("Chesapeake Operating").  McCall has an interest in these wells as a party

---

independent claim for relief" but rather pled to counter a possible statute of limitations defense.  The Defendants did not assert a statute of limitations defense in their motion to dismiss, nor is it relied upon in this Opinion in dismissing all other claims.  Therefore, these claims are also dismissed.

[3]    A working interest is
    [a]n interest in a mineral property that entitles the owner of that interest to all or a share of the mineral production from the property; the working interest owner bears the costs of exploration, development, and operation of the property, and, in return, is entitled to a share of the mineral production from the property or of the proceeds therefrom.
<u>Dernick Resources, Inc. v. Wilstein</u>, 312 S.W.3d 864, 868 n.3 (Tex. App. 2009).

to joint operating agreements ("JOAs").[4]  In the Complaint,
McCall alleges that she is a party to "at least two" JOAs, and
she does not deny that the two JOAs which the Defendants
identified are the relevant ones in this action (the "McCall
Well JOAs").  The McCall Well JOAs are dated July 2, 1973 and
April 5, 1979.  Certain Chesapeake Defendants are parties to
other JOAs to which members of the purported class (the
"Purported Class") are parties (together with the McCall Well
JOAs, the "Purported Class JOAs").

A JOA controls the relationship between co-tenants in a
mineral property.  The Purported Class JOAs are all based on a
form document known as the AAPL Model Form Operating Agreement,
which has been widely used for decades.  Pursuant to the
Purported Class JOAs, the working interest owners have joint
ownership of the unproduced oil, gas and mineral reserves in the
ground.

The clauses McCall alleges are most relevant to the claims
of the Purported Class are identical in each of the Purported
Class JOAs.  These clauses identify the proportional interests
of the parties to the JOA ("Interests of the Parties Clause"),

---

[4]    An Oklahoma court found that Chesapeake Operating was the
Operator in at least one of these JOAs.  McCall v. Chesapeake
Energy Corp, et al., 164 P.3d 1120, 1122 (Okla. Civ. App. 2007).
McCall, making no distinctions among Chesapeake Defendants in
her opposition brief (just as she employs group pleading in her
Complaint), refuses to specify which Chesapeake entity is the
Operator under the McCall Well JOAs.

prevent a working interest owner from selling or assigning only a portion of its interest ("Maintenance of Uniform Ownership Interest Clause"), require that any interests created subsequent to the execution of the JOA shall be made subject to the JOA ("Subsequently Created Interest Clause"), and prevent a working interest owner from dividing its interests ("Waiver of Rights to Partition Clause").  McCall acknowledges that the Purported Class JOAs allow a working interest owner to sell or assign the entirety of its interests under a particular JOA.

Three of the Chesapeake Defendants, Chesapeake Investments, LP ("Chesapeake Investments"), Chesapeake Exploration, LLC ("Chesapeake Exploration") and Aubrey McClendon ("McClendon"), the Chairman and CEO of Chesapeake Energy Corporation ("Chesapeake Energy"), have entered into ten volumetric production payment transactions ("VPPs") with certain of the Bank Defendants since December 31, 2007.  These VPPs (the "Purported Class VPPs") are identically structured.[5]  Chesapeake has an interest in the minerals at issue in each of the Purported Class VPPs, but it does not have sole ownership; members of the Purported Class are also working interest owners of the minerals at issue.  McCall purports to represent all

_____

[5]    McCall's allegations about the effect of the Purported Class VPPs on her interests and the interests of the Purported Class are legal conclusions, which need not be accepted as true. Ashcroft v. Iqbal, --- U.S. ---, 129 S. Ct. 1937, 1949 (2009). These will be discussed below.

these working interest owners with interests in wells that are subject to one of the Purported Class VPPs.

Some of the Bank Defendants "originate" and/or "market" the Purported Class VPPs.  Through the Purported Class VPPs, oil and gas is sold to certain Bank Defendants, and Chesapeake Investments later buys back these resources.  Chesapeake delivers the gas and oil to the participating Bank Defendants free of costs.

Defendants concede that three of the ten Purported Class VPPs concern Chesapeake Investment's interests in the McCall Wells.  These are:

1) a VPP dated January 31, 2008 between McClendon, Chesapeake Investments and TW Investors, LLC ("TW Investors VPP");
2) a VPP dated August 1, 2008 between Chesapeake Exploration and Sooner Gas Trust ("Sooner VPP"); and
3) a VPP dated August 21, 2008 between McClendon, Chesapeake Investments and Blue Devil Trust ("Blue Devil VPP").

McCall argues that certain Bank Defendants are receiving deliveries from her wells through as many as five VPPs.  The Complaint identifies which five VPPs are connected to wells in Oklahoma, where the McCall Wells are located.  In addition to the ones identified by the Defendants, these are:

1) a VPP dated December 31, 2008 between Chesapeake Exploration and Argonaut VPP, LLC ("Argonaut VPP"); and
2) a VPP dated May 2008 between Chesapeake Exploration and High Plains Gas Trust ("High Plains VPP")[6]

---

[6]     Although the property exhibits attached to the Argonaut VPP

(collectively, the "McCall Well VPPs").  McCall alleges that the
Bank Defendants that entered into the VPPs with the Chesapeake
Defendants are "nominal entities existing on paper only and
exist only as conduits for the banks to 'loan' money to for the
purpose of funding the VPP transactions."

McCall alleges that, as a result of the Purported Class
VPPs, and pursuant to the Purported Class JOAs, McCall and the
Purported Class are entitled to proceeds from oil and gas sales
which they have not received.  She also alleges that through the
Purported Class VPPs, the Defendants are converting the
Purported Class's share of gas and oil.


DISCUSSION

Defendants have moved to dismiss McCall's complaint on
various grounds.  First, they argue that because McCall lacks
Article III standing to assert claims arising out of the
Purported Class JOAs that she is not a party to any Purported
Class VPPs that are not McCall Well VPPs, those claims, and the
defendants not party to the McCall Well VPPs, should be
dismissed.  Second, the Defendants contend that the allegations

and the High Plains VPP show that these VPPs do not cover wells
in Beckham County, Oklahoma, where the McCall Wells are located,
these two VPPs will still be considered so as to resolve any
potential contractual ambiguity on the geographic extent of the
interests connected to these wells in favor of the plaintiff.
Subaru Distribs. Corp. v. Subaru of America, Inc., 425 F.3d 119,
122 (2d Cir. 2005).

ignore their corporate forms and make allegations regarding groups of Defendants without specifying which actions were taken by any individual defendant.  Finally, the Defendants argue that McCall fails to state claims for breach of contract, conversion, civil conspiracy and an accounting for which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6).

"Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'"  Iqbal, 129 S. Ct. at 1949.  To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  Id. (citation omitted).  Applying this plausibility standard is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  Id. at 1950.

When considering a motion to dismiss under Rule 12(b)(6), a trial court must "accept all allegations in the complaint as true and draw all inferences in the non-moving party's favor."  LaFaro, 570 F.3d at 475.  A complaint must do more, however, than offer "naked assertions devoid of further factual enhancement," and a court is not "bound to accept as true a legal conclusion couched as a factual allegation."  Iqbal, 129 S. Ct. at 1949-50.  Accordingly, a court may disregard "threadbare recitals of a cause of action's elements, supported

by mere conclusory statements." Id. at 1940.  "In determining the adequacy of the complaint, the court may consider any written instrument attached to the complaint as an exhibit or incorporated in the complaint by reference, as well as documents upon which the complaint relies and which are integral to the complaint." Subaru, 425 F.3d at 122.

I.   McCall Does Not Have Standing to Bring Claims for Breach of Non-McCall Well JOAs or for Conversion Pursuant to Non-McCall Well VPPs.

Defendants claim that McCall lacks Article III standing to assert claims unconnected to the McCall Well JOAs and the McCall Well VPPs, and that this lack of standing cannot be cured by her attempt to bring a claim on behalf of the Purported Class. Article III of the United States Constitution limits the jurisdiction of federal courts to "cases" and "controversies." U.S. Const. art. III, § 2.  "In order to ensure that this bedrock case-or-controversy requirement is met, courts require that plaintiffs establish their standing as the proper parties to bring suit." W.R. Huff Asset Management Co., LLC v. Deloitte & Touche LLP, 549 F.3d 100, 106 (2d Cir. 2008) (citation omitted).  To establish standing, a plaintiff must show "[1] that he 'suffered an injury-in-fact -- an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical'; [2] that there was a 'causal connection between the injury and

the conduct complained of'; and [3] that it is 'likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'"  Carver v. City of New York, 621 F.3d 221, 225 (2d Cir. 2010) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)).  In a proposed class action, "the named class plaintiffs must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent."  Central States Southeast & Southwest Areas Health & Welfare Fund v. Merck–Medco Managed Care, L.L.C., 433 F.3d 181, 199 (2d Cir. 2005) (citation omitted).

McCall, the only named plaintiff, cannot claim to have any legally protected interest in the JOAs to which she is neither a party nor a beneficiary.  "[U]nder well-settled contract principles, only the parties to a contract have the right to complain of a breach of the contract, with the exception that a nonparty who proves the contract was made for his benefit, and that the contracting parties intended he benefit from the contract, may bring an action on the contract as a third party beneficiary."  Prize Energy Resources, L.P. v. Cliff Hoskins, Inc., --- S.W.3d ----, 2011 WL 648996, at *6 (Tex. App. Feb. 23, 2011); accord Woolard v. JLG Indus., Inc., 210 F.3d 1158, 1169

(10th Cir. 2000) (interpreting Oklahoma contract law).[7]  McCall
has made no allegation that she is a party or a beneficiary to
any JOA other than the McCall Well JOAs.  Therefore, she has not
established any injury-in-fact from the alleged breach of the
Purported Class JOAs that are not McCall Well JOAs.  McCall thus
has no standing to bring a breach of contract claim against the
Bank Defendants who are not signatories to the McCall Well VPPs.

     McCall's conversion claim relies entirely on the
Defendants' participation in the VPPs connected to the wells of
the Purported Class, and there is no independent basis for this
claim in the Complaint.  But McCall has not alleged that she has
any interest in the oil and gas properties allegedly converted
by the Defendants through Purported Class VPPs other than those
related to the McCall Well VPPs.  She therefore has no standing
to bring a claim of conversion of any properties pursuant to any
Purported Class VPPs that are not McCall Well VPPs, and no
standing to bring this claim against the Bank Defendants that
did not sign a McCall Well VPP -- MS Tela, LLC; MS Permian, LLC;
Morgan Stanley; Obsidian Natural Gas Trust; Wells Fargo Delaware
Trust Company, NA; Barclays Capital, Inc.; GS Loan Partners;

---

[7]     The Defendants argue that Oklahoma law should apply to the
JOAs, which do not include a choice of law provision.  McCall
does not contest this, but rather cites without explanation the
case law of various states in interpreting the JOAs, chief among
them Oklahoma and Texas.

Wells Fargo & Company; Wells Fargo Securities, LLC; Falcon VPP LP; and DB Energy Trading LLC.[8]  Similarly, McCall cannot bring a conversion claim against the Chesapeake Defendants that are not signatories to any McCall Well VPPs -- Chesapeake Energy; Chesapeake Louisiana, LP; and Chesapeake Appalachia, LLC.

McCall contends that she has standing to bring claims for the alleged breach of all the Purported Class JOAs and for the conversion of oil and gas connected to all the Purported Class VPPs because there are cases involving oil and gas rights

---

[8]    McCall has alleged that the Bank Defendants that signed McCall Well VPPs -- TW Investors, LLC; Sooner Gas Trust; Blue Devil Trust; Argonaut VPP, LLC; and High Plains Gas Trust -- are owned by "Wells Fargo," and that these signatory entities were "special purpose vehicles existing on paper only."  "Questions relating to the internal affairs of corporations . . . are generally decided in accordance with the law of the place of incorporation."  United States v. Funds Held in the Name or for the Benefit of Wetterer, 210 F.3d 96, 106 (2d Cir. 2000).  In order to state a claim to pierce the corporate veil under Delaware law, where these entities are incorporated, McCall

> must allege facts that, if taken as true, demonstrate
> the [parent company's] complete domination and control
> of the [subsidiary.]  The degree of control required
> to pierce the veil is exclusive domination and control
> to the point that the [subsidiary] no longer has legal
> or independent significance of its own.  Piercing the
> corporate veil under the alter ego theory requires
> that the corporate structure cause fraud or similar
> injustice.  Effectively, the corporation must be a
> sham and exist for no other purpose than as a vehicle
> for fraud.

Wallace ex rel. Cencom Cable Income Partners II, L.P. v. Wood, 752 A.2d 1175, 1184 (Del. Ch. 1999) (citation omitted).  McCall fails to allege facts necessary to support a theory of piercing the corporate veil. Therefore, the Complaint does not sufficiently demonstrate that she has standing to sue defendants Wells Fargo & Company and Wells Fargo Securities, LLC.

disputes that allow a working interest owner to represent a class of other working interest owners.  The basic principle that it may be possible to represent a class of working interest owners, however, is not in dispute.  The cases to which McCall cites do not consider the relevant standing issue here -- whether a single plaintiff or group of plaintiffs who do not share contractual or property interests with the class they purport to represent may nonetheless bring a claim on behalf of that class.  In fact, the cases upon which McCall relies do not consider the issue of standing at all.

McCall also argues that her conspiracy claim provides a "juridical link" which provides her standing against all the Bank Defendants.  The juridical link doctrine, however, is employed to allow plaintiffs to satisfy the adequacy or typicality requirements for class certification where there was an alleged conspiracy or other relationship between defendants. Cassese v. Washington Mut., Inc., 262 F.R.D. 179, 183-84 (E.D.N.Y. 2009).  McCall does not cite to any case where the juridical link doctrine was found to cure a named plaintiff's lack of Article III standing, and, other courts in the Second Circuit have dismissed this same argument.  See id.; In re AIG Advisor Group, No. 06 Civ. 1625(JG), 2007 WL 1213395, at *6 (E.D.N.Y. 2007).

Finally, McCall contends that the Defendants' challenge to

her standing is premature until class certification issues are briefed.  In support of this argument, she cites Ortiz v. Fireboard Corp., 527 U.S. 815 (1999) and Amchem Prods., Inc. v. Windsor, 521 U.S. 591 (1997), in which the Supreme Court approved the consideration of class certification issues before reaching any Article III challenge.  In both cases, the Supreme Court reviewed decisions by courts of appeals regarding decertification of a class created for settlement purposes.  Due to this particular procedural posture, it was necessary to first address challenges to the certification of the classes because the Article III issues "would not exist but for the [class-action] certification."  Amchem, 521 U.S. at 612; see Ortiz, 527 U.S. at 831.  As the Honorable Paul A. Crotty stated in the case on which McCall relies for this proposition, Amchem and Ortiz "appear to be sui generis, involving global mass tort settlements in distinct and unique procedural postures."  In re Salomon Smith Barney Mut. Fund Fees Litig., 441 F.Supp.2d 579, 606 (S.D.N.Y. 2006).  This action is not in an analogous procedural posture because the certification of a class is not being challenged.  Therefore, McCall's standing must be determined now; an "Article III court must be sure of its own jurisdiction before getting to the merits."  Ortiz, 527 U.S. at 831.[9]

---

[9]     McCall also contends that further discovery is necessary

II.  McCall Fails to State a Claim for Breach of Contract.

    A. The McCall Well VPPs Do Not Convey Oil and Gas Properties
       In the Ground, But Rather An Overriding Royalty Interest.

    The parties to a JOA have a shared undivided interest in

the oil and gas in the ground; "no single owner has exclusive or

separate rights as to any particular portion of the tract, but

all such owners have a common ownership and share

proportionately in the enjoyment of the property as a whole."

1-5 Kuntz, Law of Oil and Gas § 5.1 (2011) [hereinafter

"Kuntz"]; 8-J Williams & Meyers Manual of Oil and Gas Terms

(2009) [hereinafter "Manual of Terms"] (definition of "joint

operating agreement").  These "[o]wners of undivided interests

in the working interest in an oil and gas lease are tenants in

common."  De Mik v. Cargill, 485 P.2d 229, 231 (Okla. 1971).

But under JOAs that provide that "[e]ach party shall take in

kind or separately dispose of its proportionate share of all oil

and gas produced," the oil and gas becomes personal property of

the working interest owners in proportion to their share once

produced from the ground.  1-2 Kuntz § 2.5.

    Working interest owners can dispose of their share of the

---

before any standing determination is made because the parties
dispute how many Purported Class VPPs apply to the McCall Wells.
This argument is moot because this Opinion finds that McCall
lacks standing only as to those Purported Class VPPs that, by
the terms in her Complaint, have no connection to oil and gas
properties in Oklahoma where her wells are located, and that as
many as five Purported Class VPPs were McCall Well VPPs.

produced oil and gas through a variety of transactions,
including by selling an overriding royalty interest or a
production payment.  An overriding royalty interest conveys oil
and gas produced at the surface from the seller's share of
production, free of the expense of the production.  8-O Manual
of Terms; see also XAE Corp. v. SMR Property Mgmt. Co., 968 P.2d
1201, 1207 (Okla. 1998).  This interest attaches only once the
oil and gas is produced from the ground.  XAE Corp., 968 P.2d at
1207; 1-16 Kuntz § 16.2 ("a mineral interest is thought of as
being a right to or an interest in oil or gas as they reside in
place; whereas the royalty interest is thought of as being a
right to or interest in oil or gas after capture").  A
production payment is substantially the same thing as an
overriding royalty interest, except that "its duration is
limited to the time required for the stated number of units of
production or the sum specified in the instrument creating the
oil payment to be realized; an overriding royalty, on the other
hand, normally has the same duration as the working interest out
of which it was created."  1-4 Williams & Meyers Oil and Gas Law
§ 422.3 (2010) ("[t]his difference does not appear to justify
any distinction in the nature of the property interests
created"); see also 8-O Manual of Terms (definitions of "oil
payment," "overriding royalty interest"); 8-P Manual of Terms
(definition of "production payment").

McCall's breach of contract claim[10] relies on her argument
that under the McCall Well VPPs, the Chesapeake Defendants have
sold oil and gas properties in the ground, properties in which
McCall and the other working interest owners party to the McCall
Well JOAs have an undivided interest as tenants in common.   In
so doing, the Chesapeake Defendants have allegedly breached
several provisions in the McCall Well JOAs, namely, the
Interests of the Parties Clause, the Maintenance of Uniform
Ownership Interest Clause, the Subsequently Created Interest
Clause and the Waiver of Rights to Partition Clause, which
McCall alleges prohibit the Chesapeake Defendants "from
partitioning and selling solely for themselves a portion of the
minerals in the ground."   The Defendants, on the other hand,
argue that the McCall Well VPPs sell only Chesapeake's share of
their own working interest in the oil and gas properties and
only after they have been produced, granting the Bank Defendant
purchasers an overriding royalty interest.   Such an interest is
permitted by the McCall Well JOAs and does not breach

---

[10]   The elements of a breach of contract claim are
substantially the same in either Oklahoma or Texas.   See Digital
Design Group, Inc. v. Information Builders, Inc., 24 P.3d 834,
843 (Okla. 2001) (elements are "1) formation of a contract; 2)
breach of the contract; and 3) damages as a direct result of the
breach."); Southern Elec. Servs., Inc. v. City of Houston, ---
S.W.3d ----, 2011 WL 3612300, at *3 (Tex. App. Aug. 18, 2011)
(elements are "(1) the existence of a valid contract; (2)
performance or tendered performance by the plaintiff; (3) breach
of the contract by the defendant; and (4) damages sustained by
the plaintiff as a result of the breach").

Chesapeake's contractual obligations to McCall or any other working interest owner.  This distinction -- whether the McCall Well VPPs sell oil and gas properties <u>in the ground</u> to which all working interest owners have an undivided interest or only Chesapeake's share of the oil and gas properties after they have been produced -- is recognized by all parties as the critical issue in determining whether McCall has stated a claim for breach of contract.

By the clear language of the McCall Well VPPs, the Chesapeake Defendants have sold only an interest of oil and gas carved out of their working interest in the McCall Wells and only after it has been produced from the ground.  The Purchase and Sale Agreement, a main operating document of each of the McCall Well VPPs, states that the VPP causes the sale by a Chesapeake Defendant to a Bank Defendant of "the Production Payment," a sale which "shall apply to runs of Gas" commencing as of a specified date determined in the Conveyances.  This Production Payment conveys a "term overriding royalty interest."

The Conveyance, another key VPP document, states that the overriding royalty interest conveyed to the Bank Defendant is "in and to the Subject Interests and in and to the Subject Hydrocarbons attributable thereto."  The "Subject Interests" are

> "all of the [Chesapeake Defendant's] interest in and
> to (a) the Subject Wells and (b) the estates, titles,
> and rights granted under the Leases to the extent, and

18

only to the extent, [they] give [the Chesapeake
Defendant] the right and power to own, operate and
maintain the Subject Wells and to capture, produce,
receive, sell and otherwise dispose of Hydrocarbons
<u>produced from the well bores</u> of the Subject Wells"

(emphasis supplied). "Subject Hydrocarbons" are defined as
"[g]as in and under and that may be produced . . . from the
Subject Wells from the Subject Interests." Under these
provisions, the McCall Well VPPs conveyed to a Bank Defendant
only an "overriding royalty interest" carved from the interest
that the Chesapeake Defendant itself had in the wells subject to
those documents, and no more. Furthermore, the gas and oil
properties in which the Bank Defendants received an interest
were explicitly limited to properties produced from the ground.

Other provisions of the McCall Well VPPs underline the
limitations of what was sold to the Bank Defendants. The
Production Payment "shall be satisfied solely from Production
Payment Hydrocarbons," which are defined as "Subject
Hydrocarbons conveyed to" the Bank Defendant pursuant to the
Conveyance. Therefore, the Bank Defendant "bears the risk that
actual production of Production Payment Hydrocarbons may prove
insufficient." To be clear, the Purchase and Sale Agreement
states that the Bank Defendant "will not own any rights to
conduct or direct operations [in connection with the Subject
Interests] or any tangible property interest [in the Subject
Interests] . . . all such rights, tangible property interests

19

and equipment being retained by [the Chesapeake Defendant]." These provisions emphasize that the Bank Defendants' interests are limited to oil and gas properties once produced and that the Bank Defendants have no recourse to any other oil and gas properties, including those still in the ground or those not part of the Chesapeake Defendants' working interest.[11]   Such language belies McCall's arguments about the property conveyed by the McCall Well VPPs.

In her opposition, McCall presents a list of "language from the VPP conveyances" -- a misleading list that suggests that it is directly quoting from the McCall Well VPPs while actually incorporating argument by McCall -- that she argues shows that the Purported Class VPPs convey minerals in the ground before production.  The quotes she cites do not support her argument, as each relies on the definition of terms such as "Subject Interests" and "Production Payment," which, as described above, make explicit that the McCall Well VPPs convey only production from the Chesapeake Defendants' interests in the McCall Wells.

Despite McCall's assertions, all the cases that have discussed VPPs confirm that they are common oil and gas transactions used to convey a seller's production of mineral

---

[11]   Further illustrating this point, the Gas Sales Agreements which establish the Bank Defendants' commitment to sell back the oil and gas properties to the Chesapeake Defendants refer to these properties as "the natural gas production accruing to the [Bank Defendants] pursuant to the Conveyance."

interests, not mineral interests in the ground.  Energy
Acquisition Corp. v. Millennium Energy Fund, L.L.C., 611 F.
Supp. 2d 1147, 1149 (D. Colo. 2009); Belotz v. Jefferies & Co.,
Inc., No. 98 Civ. 2587(LAP), 1999 WL 587916, at *1 n.3 (S.D.N.Y.
Aug. 4, 1999); EOG Resources, Inc. v. Department of Revenue, 86
P.3d 1280, 1282-83 (Wyo. 2004);[12] Dernick Resources, 312 S.W.3d
at 868 & n.1.

McCall's reading of Dernick Resources to support her
arguments is based on a misunderstanding of the facts of that
case.  Unlike here, the party that had entered a VPP, Dernick,
was also party to a joint venture agreement with the plaintiffs,
pursuant to which Dernick held the title to the working
interests of plaintiffs as well as its own.  Dernick Resources,
312 S.W.3d at 869.  In signing the VPP, Dernick represented that
it was the sole owner of the undivided interests in the field,
and promised to convey a portion of the production from all of
the interests in the field, which thereby included the interests
of the plaintiffs.  Id. at 881-82.  Dernick then used the
proceeds of the VPP for its own financing needs, failed to
inform the plaintiffs to whom it owed fiduciary duties under the

---

[12]   EOG Resources describes the VPP at issue in that case as
involving a sale of "a production payment in reserves in the
ground."  EOG Resources, 86 P.3d at 1283 (emphasis supplied).
The Wyoming Supreme Court clarified that in a VPP, "[a] producer
sells its production" and "[t]he buyer receives a share of oil
and gas produced."  Id. at 1282; see also id. at 1283, 1284-85.

joint venture agreement about the VPP, and withheld from the plaintiffs proceeds from the VPP proportional to the burden placed on their working interest.  Id. at 877-78.  Dernick's actions contrast with that of the Chesapeake Defendants because the McCall Well JOAs are not a joint venture agreement, and so, among other things, do not grant the Chesapeake Defendants title for McCall's working interest in the McCall Wells.  Therefore, the Chesapeake Defendants did not and could not have conveyed production from McCall's working interest to the Bank Defendants as part of the McCall Well VPPs, which explicitly limit the transaction to the interests owned by the Chesapeake Defendants. Furthermore, absent such a joint venture relationship, the Chesapeake Defendants have no obligation to inform or include McCall in a VPP transaction.

McCall argues that the public filings of Chesapeake Energy, the parent public company of the Chesapeake Defendants, support her conclusion that the Purported Class VPPs conveyed to the Bank Defendants mineral interests in the ground when they use the terms "reserves" or "proved reserves" to describe the VPPs. First, insofar as these statements might be contrary to the terms of the McCall Well VPPs, it is, of course, only the language of those VPPs that define the transactions between the Chesapeake Defendants and the Bank Defendants and that could have any impact on McCall's rights under the McCall Well JOAs.

Any discrepancies between the terms of the Purported Class VPPs and their description in Chesapeake Energy's public filings would be, at most, a misrepresentation of concern to Chesapeake Energy's shareholders and the SEC, not a basis for a breach of contract claim.

But the public filings are not inconsistent with the terms of the McCall Well VPPs as described above.  McCall has pointed to no language in the filings that suggests that the Chesapeake Defendants transferred anything beyond their own mineral interests.  Nor has she shown that the filings describe the VPPs as sales of minerals still in the ground.  "Proved reserves," are defined by the SEC as such quantities that "can be estimated with reasonable certainty to be economically producible -- from a given date forward, from known reservoirs . . . prior to the time at which contracts providing the right to operate expire" and with the "reasonable expectation that there will exist the legal right to produce or a revenue interest in the production." 17 C.F.R. § 210.4-10(a)(22), 10(a)(26).  By referring to "proved reserves" in its public filings, Chesapeake Energy was explaining no more than its affiliates were transferring produced minerals from their own working interests in the Purported Class Wells.

Similarly, the Chesapeake Defendants' accounting treatment of the Purported Class VPPs are of no consequence to the breach

23

of contract claim.  The accounting treatment of a transaction does not control the actual operation of the contract for that transaction.  And McCall has made no allegations to suggest she has a claim for improper accounting of any of the Purported Class VPPs.  In any case, Statement 19 of the Financial Accounting Standards Board ("FASB"), to which McCall cites, only indicates that there is a distinction between those production payments that involve only transfers of cash and those that include transfers of "a specified quantity of oil and gas . . . out of a specified share of <u>future production</u>" which should be recorded "as the delivery takes place."  FASB Statement No. 19, ¶ 47(a) (emphasis supplied).  This statement further confirms that the VPPs conveyed an interest in future production from the Chesapeake Defendants' working interest.

> B. In Conveying an Overriding Royalty Interest in Their Own Production Through the McCall Well VPPs, the Chesapeake Defendants Do Not Breach the McCall Well JOAs.

The McCall Well JOAs explicitly acknowledge the right of working interest owners such as the Chesapeake Defendants to sell overriding royalty interests in their proportionate share of production from the McCall Wells and others, without burdening the interests of the other working interest owners. This is what the Chesapeake Defendants have done through the McCall Well VPPs.  For example, the JOAs state that

> [e]ach party shall take in kind or separately dispose

24

> of its proportionate share of all oil and gas produced
> . . . . . Each party shall pay or deliver . . . all
> royalties, overriding royalties, or other payments due
> on its share of such production, and shall hold the
> other parties free from any liability therefor.

Other provisions state that "[i]f the interest of any party . . . is subject to an overriding royalty, production payment or other charge . . . such party shall assume and alone bear all excess obligations," and that any overriding royalty or production payment interest "shall be specifically made subject to all the terms of" the JOAs.  McCall, in fact, acknowledges that parties have the right to create an overriding royalty interest in the JOAs.  This right was also recognized by a Court of Civil Appeals in Oklahoma, which found that under the McCall Well JOAs, each working interest owner had the right to sell its proportionate share of the production of oil and gas and McCall could not force Chesapeake Operating to include her in its contracts disposing of the sale of its share.  McCall, 164 P.3d at 1126.

The overriding royalty interests such as those conveyed in the McCall Well VPPs being explicitly allowed in the McCall Well JOAs, it is not surprising that the McCall Well VPPs do not violate the clauses of the McCall Well JOAs cited in the Complaint.  The McCall Well JOAs' Maintenance of Uniform Ownership Interest Clause provides that

> [f]or the purpose of maintaining uniformity of

> ownership in the oil and gas leasehold interests
> covered by this contract, and notwithstanding any
> other provisions to the contrary, no party shall sell,
> encumber, transfer or make other disposition of its
> interest in the leases embraced within the Unit Area
> and in wells, equipment, and production unless such
> disposition covers either: (1) the entire interest of
> the party in all leases and equipment and production;
> or (2) an equal undivided interest in all leases and
> equipment and production in the Unit Area.

The McCall Well VPPs do not convey to the Bank Defendant "any

rights to conduct or direct operations [in connection with the

Subject Interests] or any tangible property interest [in the

Subject Interests] . . . all such rights, tangible property

interests and equipment being retained by [the Chesapeake

Defendant]."  Thus, through the McCall Well VPPs, the Bank

Defendants were sold only an equal undivided interest in

production, not any property interests.  The sale did not impact

the uniformity of ownership in the oil and gas leasehold

interests under the JOAs.

The Waiver of Rights to Partition Clause in the McCall Well

JOAs states that "[e]ach party hereto owning an undivided

interest in the Unit Area waives any and all rights it may have

to partition and have set aside to it in severalty its undivided

interest therein."  The "Unit Area" is defined as "all of the

lands, oil and gas leasehold interests and oil and gas interests

intended to be developed and operated for oil and gas purposes."

"Oil and gas interests" is defined as "unleased fee and mineral

interests <u>in tracts of land</u> lying within the Unit Area"
(emphasis supplied).  Thus, the Waiver of Rights to Partition
Clause only limits rights to divide the land, leasehold interest
and oil and gas <u>in the ground</u> subject to the McCall Well JOAs,
not the oil and gas <u>production</u> sold in the McCall Well VPPs.

McCall alleges that she and the other parties to the McCall
Well VPPs are subjected to excess charges and a diversion of
production in violation of the McCall Well JOAs' Interests of
the Parties Clause, which provides that "[i]f the interest of
any party . . . is subject to an overriding royalty, production
payment, or other charge . . . such party shall assume and alone
bear all such excess obligations."  These conclusory allegations
are devoid of factual enhancement and so need not be accepted as
true.  <u>See</u> <u>Iqbal</u>, 129 S. Ct. at 1949-50.  The monthly statement
that McCall suggests supports the excess charges claim shows --
by her own admission -- that her share of lease operation
expenses, taxes and royalties have not been changed.  Stability
in her share of expenses could only support a finding that
McCall was overcharged if McCall were correct in arguing that
the Chesapeake Defendants had sold McCall's working interest
through the McCall Well VPPs.  She is not.[13]

---

[13]   An undated letter from Chesapeake Operating that McCall
offers in opposition to the motion to dismiss is similarly
unhelpful to her claim that she has been overcharged.  The

III. <u>McCall Fails to State a Claim for Conversion.</u>

"Conversion occurs when a defendant exercises unauthorized dominion over personal property in interference with a plaintiff's legal title or superior right of possession." <u>LoPresti v. Terwilliger</u>, 126 F.3d 34, 41 (2d Cir. 1997); <u>see also</u> <u>Lawmaster v. Ward</u>, 125 F.3d 1341, 1353 (10th Cir. 1997) ("Under Oklahoma law, a conversion is any act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein."). McCall's claim for conversion is based entirely on her reading of the McCall Well VPPs as conveying mineral interests in the ground from the undivided interest of all owners with working interests in the McCall Wells. She presents no further allegations in the Complaint, nor any argument in the opposition, to suggest an alternate basis for finding that the Defendants have converted her interests in the McCall Wells. Having found that the VPPs only convey minerals after production from the Chesapeake Defendants' working interest, McCall has not made any plausible allegation that the Defendants have exercised dominion over any property in which she has rights. Therefore, even assuming that the interests transferred by the McCall Well VPPs are personal property that could be converted, this claim is also dismissed.

---

letter states that her net "share of the gas revenue will remain unaffected" by changes in the Chesapeake Defendants' production delivery contracts.

IV.  <u>McCall Fails to State a Claim for Civil Conspiracy.</u>

Under the laws of New York, Oklahoma and Delaware, the states in which the various Defendants are located, there is no independent tort of conspiracy and a claim of civil conspiracy must be dismissed if the underlying torts are also dismissed. <u>Peterson v. Grisham</u>, 594 F.3d 723, 730 (10th Cir. 2010); <u>Kirch v. Liberty Media Corp.</u>, 449 F.3d 388, 401 (2d Cir. 2006); <u>Ramunno v. Cawley</u>, 705 A.2d 1029, 1039 (Del. 1998).  As the other tort claims that might provide the basis for a civil conspiracy claim have been dismissed, this also fails as a matter of law.

V.  <u>Accounting</u>

McCall's claim for an accounting is based explicitly on the rights afforded parties to the Purported Class JOAs.  McCall alleges that the Defendants "have a contractual duty to maintain books and records of the lease operations for the [Purported Class] . . . [the Purported Class] also ha[s] audit rights under the JOAs."  Indeed, as described in Exhibit C to the McCall Well JOAs,

> [a] Non-Operator, upon notice in writing to Operator
> and all other Non-Operators, shall have the right to
> audit Operator's accounts and records relating to the
> accounting hereunder for any calendar year within the
> twenty-four (24) month period following the end of
> such calendar year.

Thus, McCall has a right to audit the Operator's accounts under

the McCall Well JOAs, and the Operator's failure to comply with that right would be a breach of those contracts.[14]  This accounting claim is thus truly a breach of contract claim.

This claim fails for several reasons.  First, only the "Operator" is subject to an audit under the JOAs.  The Defendants have identified the Operator as Chesapeake Operating, which is not a defendant named in this action.  With respect to one of the McCall Well JOAs, an Oklahoma court also found that Chesapeake Operating was the Operator.  McCall, 164 P.3d at 1122.  As noted above, McCall has not identified in her Complaint or opposition to this motion which Chesapeake entity is the Operator under the McCall Well JOAs.  Insofar as it is Chesapeake Operating, and not a defendant named in this action, her accounting claim must fail.

Second, McCall has not alleged that she has given the Operator written notice of her intent to audit its accounts, a condition precedent that must be fulfilled before she can make claim that the Operator breached its obligation to permit such an audit.  Harwell v. State Farm Mut. Auto. Ins. Co., 876 S.W.2d 494, 498 (Tex. App. 1994).  Finally, there is no allegation of a refusal by the Operator to turn over its accounts and records, which would be required to allege a failure to perform, a

---

[14]   McCall has not identified any other provision of the McCall JOAs that would provide her a right to conduct an accounting of the Chesapeake Defendants.

required element of any breach of contract claim.  See Digital
Design Group, 24 P.3d at 843; Southern Elec. Servs., 2011 WL
3612300, at *3.

In her opposition to the motion to dismiss, McCall appears
to argue that she also has a claim to an equitable remedy of an
accounting.  But nowhere in the Complaint does she assert an
equitable claim, mentioning only the "accounting" right under
the McCall Well JOAs.  McCall may not use her opposition to the
motion to dismiss to amend her Complaint, especially as she has
already taken the opportunity to amend granted by Federal Rule
of Civil Procedure 15(a)(1) and did not seek permission to
further amend it pursuant to Federal Rule of Civil Procedure
15(a)(2).[15]

---

[15]   McCall also seems to confuse her claim for accounting with
her rights to discovery under the Federal Rules.  At no point
did the Defendants argue that she be prevented from taking
discovery, nor does the dismissal of McCall's accounting claim
limit in any way the rights to discovery she would be afforded
had this action survived the motion to dismiss.

CONCLUSION

The Defendants' April 8, 2011 motion to dismiss is granted. The Clerk of Court shall enter judgment for the Defendants and close this action.

Dated:    New York, New York
          September 13, 2011


                              _____
                                      DENISE COTE
                              United States District Judge